[No. S004421. Crim. No. 22477. Dec. 31, 1990.]

THE PEOPLE, Plaintiff and Respondent, v.
BLUFFORD HAYES, JR., Defendant and Appellant.

**COUNSEL**

Richard Such, under appointment by the Supreme Court, for Defendant and Appellant.

John K. Van de Kamp, Attorney General, Steve White, Chief Assistant Attorney General, Edmund D. McMurray and William G. Prahl, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

KENNARD, J.—This is an automatic appeal from a judgment of death. (Pen. Code, § 1239, subd. (b); all further statutory references are to this code unless otherwise indicated.) Defendant Blufford Hayes, Jr., was convicted by a jury of one count each of robbery (§ 211), burglary (§ 459), and first degree murder (§ 187). The jury found as special circumstances that the murder was committed in the perpetration of both robbery and burglary (§ 190.2, subd. (a)(17)), and it found that defendant used a deadly weapon, a knife, in the commission of each offense (§ 12022, subd. (b)).

We shall reverse the conviction and sentence for robbery, and the robbery-murder special circumstance, but otherwise shall affirm the judgment, including the imposition of the death penalty.

### I. FACTS AND PROCEEDINGS

The body of Vinod Patel, the resident manager and half owner of the Rice Motel in Stockton, was found on the floor of one of the motel rooms. Patel's body was bound with coat hanger wire; he had been stabbed to death. The motel's office, as well as the adjoining living quarters for the manager, had been ransacked. The missing items included cigarettes and cash. Testifying in his own behalf at trial, defendant admitted killing Patel but maintained that he did so only after being assaulted by Patel.

### A. The Prosecution's Case

On January 1, 1980, defendant's sister, Barbara Lord, was living in room 15 of the Rice Motel. She had spent the previous night in the room drinking and talking with defendant and others. Defendant was alone in the room when Lord left the motel that morning. He was wearing a dark blue three-piece suit and a light blue, long-sleeved shirt. He usually carried a small leather shoulder pouch or bag. Lord saw Vinod Patel before she left; he called a cab for her. She may have asked him to repair the leaky sink in room 15's bathroom.

Bearla Mae Wyatt, another resident of the Rice Motel, went to the motel office about 9:30 a.m. There she saw defendant complaining to Patel about a

problem with "water going everywhere" in the bathroom. Patel did not seem to understand defendant's explanation; he invited defendant to demonstrate what he meant in Patel's own living quarters. Wyatt left the office; when she returned 10 to 15 minutes later, defendant and Patel were coming out of Patel's bathroom area. Patel told defendant he would come to defendant's room later.

On that same morning Michele Gebert, who lived at the Rice Motel with Andrew James, was awakened by knocking at her door. Upon opening the door she found defendant, wearing a dark blue suit coat and matching pants but no shirt or vest. There were wet spots on the suit coat. Defendant seemed to be nervous; he told Gebert he wanted James to give him a ride. Gebert awakened James, who went into the bathroom. Defendant said something about having "ripped the office off," but he told Gebert not to worry about Patel reporting it because Patel "would not say anything to anybody." Defendant left with James.

About 30 minutes after she had last seen Patel with defendant, Wyatt looked out the window of her room and saw defendant carrying a box across the motel parking lot to a car. James was standing on the opposite side of the car as defendant walked toward it.

When James got into his car with defendant, he saw in the backseat two boxes, each containing thirty cartons of cigarettes. Defendant said he had to leave and urged James to "hurry up." James observed that the back of defendant's right hand was swollen, "like he had been in a scuffle." James noticed dark stains on defendant's suit jacket; defendant remarked that he had to take the suit off. Defendant asked to be taken to his mother's house. James inquired, "What's happening?" Defendant said he had "offed" Patel because Patel woke him up and because Patel "swung on him." Defendant said he had torn up the motel office looking for money and had found 22 or 23 $1 bills. James later saw approximately that many $1 bills in defendant's possession when defendant paid James $3 for gas. James asked defendant if he had left fingerprints; defendant said he "used something" so as not to leave any. Defendant asked if James knew where to get rid of the cigarettes; James said he did not.

James drove defendant to his mother's house and helped him unload the cigarettes onto the front porch. James drove straight back to the motel, noticing as he arrived that the door of the motel office was open. He looked in and saw cigarettes on the floor. James left again in the car with Gebert; later that day, after hearing news reports on the radio, they contacted the police to report their observations.

When Lord returned to room 15 that afternoon, she found Patel lying on the floor in front of the doorway, his hands and feet bound with coat hanger wire. Lord tried without success to awaken Patel. After noticing the blood from his wounds, Lord ran from the room and asked another motel resident to call the police.

Police officers, who arrived at the scene about 1 p.m., determined that Patel was dead. In room 15 they found: a light blue, long-sleeved shirt and a dark blue vest, both stained with blood; a leather shoulder pouch containing an empty sheath for a fixed-blade knife; and two items, a wine bottle and a paper bag, that bore defendant's fingerprints. The walls and floor of the bathroom were spattered with blood. The motel office and adjoining manager's living quarters appeared to have been ransacked: drawers had been pulled out, mattresses had been removed from beds, a lamp was on its side, and various items were strewn about. The cash drawer, which normally contained $40 to $50, had been pulled out and was empty. The normal stock of approximately 40 cartons of cigarettes was gone. A hunting knife found in the living quarters fit the sheath found in the shoulder pouch in room 15.

The blood types of defendant and Patel were determined and found to be identical. Blood on the dark blue vest, the light blue shirt, and the hunting knife was consistent with this blood type. The blood on the shirt was on the outside of the cuff.

An autopsy revealed that Patel had received at least twenty-two cutting and stabbing wounds, including three stab wounds that penetrated the heart and three that penetrated the lungs. Some of the wounds appeared to be defensive: slashing wounds to the left palm and forearm and a stab wound that went through the left hand. The wounds had been caused by a fairly heavy instrument with one sharp and one square edge, consistent with the hunting knife found in the manager's living quarters. The coat hanger bindings did not leave marks on the body; it appeared the victim had not greatly resisted the binding and may have been unconscious or even dead at the time. Death occurred at approximately 10 a.m., give or take an hour, and was caused by massive internal bleeding due to multiple stab wounds. The wounds probably incapacitated the victim and rendered him unconscious in one or two minutes, and death probably ensued in five to fifteen minutes.

Defendant was arrested in Oregon a few weeks later. When interviewed there by Sergeant Wingo on January 23, 1980, defendant said he had left his sister's room at the Rice Motel between 3 and 3:30 a.m. on January 1 and had not returned.

## B. *The Defense Case*

On December 27, 1979, Patel had asked the police to arrest defendant for trespassing. Patel reported that defendant had been renting a room but had stopped paying rent and had been involuntarily checked out of the motel. Defendant had then broken into his former room on each of the preceding five days. Officers investigating the complaint found defendant in his former room. Defendant admitted breaking into the room but said he intended to pay as soon as his girlfriend brought him some money. There were fresh needle marks on defendant's arm and he appeared to be under the influence of an opium derivative, probably heroin. Judging by the needle marks or "tracks" on defendant's arm, one of the officers, who was an expert in such matters, concluded that defendant was probably a heroin addict. Defendant declined to discuss his narcotics usage. He was arrested for trespassing and for being under the influence of a controlled substance.

Defendant testified in his own behalf. He said that at times he had used as much as $100 worth of heroin per day but that at the end of December 1979 he was an occasional user. He had also been injecting Ritalin for six to seven months. On December 27, 1979, he was under the influence of heroin and Ritalin. He did not break into a room; because he had not paid any rent for a couple of days, he reentered his room by a window when he returned to find a lock on the door.

Defendant was awake for the three nights immediately preceding New Year's Eve. He spent New Year's Eve in the company of his sister, Barbara Lord, his brother, Robert Hayes, Bearla Wyatt, and an unnamed friend. Defendant injected himself with heroin about 9 a.m. and 9 p.m. on December 31 and again about 3 a.m. on January 1. Appellant injected Ritalin about midnight. He also drank some brandy.

On the morning of January 1, defendant went to the manager's office and told Patel that the water would not shut off in the sink in his sister's room. Patel asked defendant to turn the water off underneath the sink and said he would come later that day to fix it. After purchasing a bottle of wine, defendant returned to his sister's room, took a few drinks of wine, and went to sleep. Defendant was awakened when his face was slapped. Defendant struck back and opened his eyes. He saw Patel with a knife in his hand. Defendant recognized the knife as having been in the room in a sheath inside a leather pouch. The pouch did not belong to defendant and may have belonged to his brother. Defendant reached for Patel, who swung the knife and cut defendant across the hand. Defendant grabbed Patel and they wrestled.

Defendant twisted Patel's arm until he dropped the knife. Defendant pushed Patel away and picked up the knife. Patel reached for a butcher knife that was on a dresser. Defendant yelled for him to stop, then ran over to him and started hitting and stabbing him. Patel stopped reaching for the knife and hit defendant on the left side of the body and the eye. Defendant backed up and Patel went into the bathroom. Defendant heard a loud noise from the bathroom, then Patel emerged and fell to the floor. Defendant picked up the butcher knife from the floor and placed it in a dresser drawer. Patel was trying to get up. Defendant bound Patel's hands and feet with coat hangers. Defendant removed his shirt, put on his suit coat, and went to the room shared by Gebert and James.

Gebert answered defendant's knock and told him James was asleep. Defendant entered the room, awakened James, and told him that he had to "down" someone. When James said he did not believe it, defendant told him to look for himself. James then left the room. After some time, defendant looked out of Gebert's room and saw James near the office. Defendant followed him and found him in the manager's living quarters. Defendant asked James what he was doing and urged him to hurry up. At James's request, defendant picked up two boxes of cigarettes and carried them to James's car; James carried two boxes himself. James then drove to defendant's mother's house and dropped off defendant. James kept all the cigarettes.

Defendant displayed for the jury a one-inch-long scar below his left collarbone. Defendant testified that the scar was the result of a cut he received during his struggle with Patel. He explained the absence of any corresponding tear in the shirt he had been wearing by stating that the shirt had been completely open and was dangling from his shoulders at the time.

## C. *Rebuttal*

James Cross returned to his room at the Flamingo Motel in Stockton about 2:30 a.m. on January 5, 1980. Hearing a thumping noise coming from the room above, he yelled: "Would you quiet down?" The noise continued, so he went upstairs. Defendant met him in the upstairs hallway and said, "You're going to apologize to my lady." Defendant pushed him into room 20 where Cross saw a woman lying on a bed. Defendant shoved Cross and hit him with a pistol across the face, on the side of the head, and in the body. Cross sat down at the corner of the bed. Defendant asked if Cross had any money. Cross pulled 10 to 15 $1 bills from his shirt pocket and placed them on the bed. Defendant told the woman to give him coat hangers, and she complied. Defendant bound Cross's hands with one of the coat hangers, then proceeded to search his pockets, removing $150 in cash. Defendant

also removed Cross's boots, searched them, and bound Cross's feet with another coat hanger.

Defendant asked if Cross had more money downstairs where he lived; Cross said he did not. Defendant asked the woman to search Cross's room. She returned after five minutes and said she had found nothing. Defendant again asked Cross if he had more money; Cross said he kept money in the office. "You God-damn M-F," defendant responded, "don't you believe I kill you?" Defendant fired a shot over Cross into the floor and told the woman to call a cab. The woman again left and returned in a few minutes. Defendant gagged Cross with a towel, threw a bedspread over his body, and left the room with the woman, taking all their possessions. Throughout the encounter defendant did not seem drowsy or drunk but appeared "just like a maniac." Cross managed to work the gag loose, crawl to the door, open the door, and yell for help. The motel manager untied him and called the police.

In the motel room, defendant's fingerprints were found on a root beer can, a wine bottle, and a brandy bottle. A bullet was embedded in the floor at the spot indicated by Cross. When the police questioned defendant about the incident following his arrest in Oregon, he denied all involvement, maintaining he had not been inside the Flamingo Motel for more than a year.

D. *Penalty Phase*

In 1972, when he was 17 years old, defendant was committed to the California Youth Authority following his admission in a juvenile court proceeding that he was guilty of the voluntary manslaughter of Raymond D. Jones, a 23-year-old man who died of 2 stab wounds to the chest. Defendant was later convicted of grand theft from the person for a May 1978 incident in which he took money from Dan Thurston at knife point, demanded more money, and stabbed Thurston above the heart, requiring a week's hospitalization. In December 1978, defendant encountered Albert Soriano on the street and requested directions, which Soriano was unable to give. Defendant then threatened Soriano with a .22-caliber pellet gun and chased him down the street.

In July 1979, after an argument with defendant over money, Melvin Lee Smith was attacked by defendant and two other men. Smith was hit in the head with a brick, transported in a car, kicked in the chest, dumped out of the car, and cut on the left arm and hand. His wounds required approximately 50 stitches and he was hospitalized overnight. In September of the same year, defendant and two companions accosted Elroy Green. Defend-

ant held a knife to Green's throat, robbed him of personal possessions, and threatened to kill him for showing disrespect to defendant's family. Green was taken in a car to a levee, where he fought defendant and took away the knife, which he threw into the water. Defendant then hit Green in the head and arm with a tire jack, breaking Green's arm and inflicting a cut to Green's head that required 32 stitches.

In October 1979, after Cedric Crawford protested that defendant had overcharged him in a sale of Ritalin, defendant pulled a gun and shot Crawford in the back of the shoulder as Crawford attempted to flee. Crawford was hospitalized for a week. For his actions, defendant was convicted of assault with a deadly weapon (§ 245).

In mitigation, two counselors testified for the defense that defendant was a model ward during his 1973-1974 California Youth Authority commitment. In their opinions, defendant would adjust well to prison life.

## II. GUILT AND SPECIAL CIRCUMSTANCE ISSUES

### A. *Alleged Wheeler Error*

During voir dire, defense counsel objected that the prosecutor was improperly exercising peremptory challenges on the basis of presumed group bias. (See *People* v. *Wheeler* (1978) 22 Cal.3d 258 [148 Cal.Rptr. 890, 583 P.2d 748].) Defense counsel made these objections (hereafter *Wheeler* objections) to seven of the first twelve peremptory challenges exercised by the prosecution. The court noted the objections but deferred ruling until each side had exercised 12 peremptory challenges. At that point, the court held a hearing outside the presence of the prospective jurors. Defense counsel explained that six of the prospective jurors peremptorily challenged by the prosecution had expressed reservations about the death penalty and that one prospective juror so challenged, Ms. Harris, was Black. The prosecutor maintained that it was permissible to exercise peremptory challenges on the basis of attitudes toward the death penalty, and he requested a ruling on this point. The trial court stated it would take this issue under submission. The court then asked the prosecutor to explain his reasons for challenging Ms. Harris. After hearing the prosecutor's explanation, the court overruled the *Wheeler* objection as to Ms. Harris.

Another hearing was held after the defense had made three additional *Wheeler* objections. Defense counsel explained that all three of the challenged jurors had expressed scruples regarding the death penalty and that one, Ms. Johnson, was also Black. In response to the court's invitation, the prosecutor explained that Ms. Johnson was challenged because she had

expressed strong reservations about the death penalty. The court overruled the *Wheeler* objection insofar as it related to race and reserved ruling insofar as it related to death penalty views.

During the final portion of the jury selection process, the defense raised *Wheeler* objections to the prosecution's peremptory challenges of two Black jurors, Mr. Hamilton and Ms. Myles, both on grounds of race. During the ensuing hearing the prosecutor noted that there were two Black jurors among the twelve regular jurors and one among the four alternates.[1] The prosecutor argued that the presence of this number of Black jurors indicated there had been no systematic exclusion on racial grounds. The prosecutor also gave reasons for challenging Mr. Hamilton and Ms. Myles. The trial court overruled the defense objections, finding that the prosecution had not used peremptory challenges to systematically exclude Blacks from the jury. Later the court overruled the defense objections to the prosecutor's exercise of peremptory challenges against prospective jurors who had expressed reservations about the death penalty. The court ruled that persons with scruples about the death penalty did not constitute a cognizable group for purposes of a *Wheeler* objection.

■ Defendant now contends that the trial court erred in overruling his *Wheeler* objections, and that the error denied him his rights under the federal and California Constitutions to a jury representing a fair cross-section of the community. He contends that the prosecutor improperly used peremptory challenges to remove prospective jurors belonging to three identifiable groups: persons with death penalty scruples, Blacks, and persons with Spanish surnames.

■ Both the federal and California Constitutions prohibit the use of peremptory challenges to remove jurors because they belong to a cognizable racial group. (*Batson* v. *Kentucky* (1986) 476 U.S. 79, 97 [90 L.Ed.2d 69, 106 S.Ct. 1712]; *People* v. *Wheeler, supra,* 22 Cal.3d at pp. 276-277.) Neither, however, prohibits the exercise of peremptory challenges on the basis of specific juror attitudes toward the death penalty. (*People* v. *Johnson* (1989) 47 Cal.3d 1194, 1222 [255 Cal.Rptr. 569, 767 P.2d 1047]; *People* v. *Caro* (1988) 46 Cal.3d 1035, 1061 [251 Cal.Rptr. 757, 761 P.2d 680].) Accordingly, here the trial court did not err in denying defendant's *Wheeler* objections to the prosecutor's exercise of peremptory challenges on the basis of death penalty attitudes.

■ A party that believes the opposing party is improperly using peremptory challenges for a discriminatory purpose must raise a timely chal-

---

[1] During the trial the Black alternate replaced a regular juror, resulting in a jury on which three of twelve jurors, or 25 percent, were Black.

lenge and make a prima facie case. (*People* v. *Johnson, supra*, 47 Cal.3d at p. 1216.) Once a prima facie case has been shown, the burden shifts to the other party to demonstrate that the peremptory challenges were exercised on a neutral basis related to the particular case to be tried. (*Ibid.*)

■ In this case, defendant did not raise a timely challenge in the trial court on the ground that the prosecutor was exercising peremptory challenges to improperly exclude Spanish-surnamed persons from the jury. Although some of the peremptory challenges to which defendant raised *Wheeler* objections were exercised against Spanish-surnamed individuals, the record indicates that in each instance the objection was directed to the individual's attitude toward the death penalty rather than to his or her ethnicity. The claim of improper use of peremptory challenges to exclude Spanish-surnamed persons is, therefore, procedurally barred for failure to raise a timely challenge in the trial court.

■ Defendant did raise timely *Wheeler* objections to the prosecutor's exercise of peremptory challenges against Black jurors. ■ By requesting the prosecutor to explain his reasons for these challenges, the trial court impliedly found that defendant had established a prima facie case. (*People* v. *Johnson, supra*, 47 Cal.3d at p. 1217; *People* v. *Turner* (1986) 42 Cal.3d 711, 718-719 [230 Cal.Rptr. 656, 726 P.2d 102].)[2] Accordingly, we proceed to evaluate the prosecutor's explanations.

■ The prosecutor stated that he had challenged Ms. Harris because there was an outstanding warrant for her arrest as a result of her failure to appear on three or four traffic tickets and he was concerned that if the warrant was served during the trial it could affect Ms. Harris's judgment. The prosecutor also said that Ms. Harris was in the process of dissolving her marriage to a person who worked for law enforcement, and he was

---

[2] In *People* v. *Bittaker* (1989) 48 Cal.3d 1046, 1092 [259 Cal.Rptr. 630, 774 P.2d 659], we concluded that the trial court had not found a prima facie case even though it had afforded the prosecution an opportunity to comment on the defendant's *Wheeler* motion. We pointed out that the trial court "did not call upon the prosecutor to explain his challenges, but to respond to the defense motion," and that when the trial court denied the *Wheeler* motion, it did so "on the ground that the defense had not made out a prima facie showing of group bias, not that the prosecutor had not rebutted such a showing." (*Ibid.*)

In determining whether to infer a trial court's finding of a prima facie case under *Wheeler*, we look to the whole record, examining the court's remarks in context. Certainly we will not infer such a finding when, as in *Bittaker, supra*, 48 Cal.3d 1046, 1092, the trial court has expressly found that the defense has failed to make a prima facie case. But when nothing in the record suggests the contrary, a trial court's statement requesting the prosecution to explain its challenges or to comment on the defendant's motion will be construed as a finding of a prima facie case. We again urge trial courts to make express findings on the existence of a prima facie case, so that reviewing courts need not determine this important question on the basis of implication. (*People* v. *Turner, supra*, 42 Cal.3d 711, 719, fn. 3.)

concerned that Ms. Harris might feel resentment toward her husband and that this resentment could cause her to be biased against law enforcement agencies in general.

As noted, the prosecutor explained that he challenged Ms. Johnson because she expressed reservations against the death penalty. He said her opposition to the death penalty was so clear that he had seriously considered challenging her for cause. Mr. Hamilton was challenged, the prosecutor explained, for three reasons: he had been turned down for employment by the Tracy Police Department; he claimed to have been accepted for employment by the Stockton Police Department, but a Stockton police officer had told the prosecutor that this was impossible due to the department's age requirement; and, finally, he had made certain claims regarding his abilities, including his claim to have a "photostatic" mind, that seemed exaggerated and gave the prosecutor a "very great feeling of unease." The prosecutor explained that Ms. Myles, the last Black juror he peremptorily challenged, had a daughter who employed a man whose stolen wallet was found at the scene of the murder, and the man's name would be mentioned during the trial.

We give great deference to the trial court's determination that the prosecution's use of peremptory challenges was not improperly based on class or group bias. (*People* v. *Johnson, supra,* 47 Cal.3d at p. 1221.) Here the trial court was well aware of its duty under *People* v. *Wheeler, supra,* 22 Cal.3d 258, to carefully scrutinize the prosecutor's reasons for exercising peremptory challenges in light of the court's personal observation of the voir dire of the challenged jurors. The prosecutor's stated reasons were facially proper and are supported by the record of voir dire. We find no basis to reject the trial court's conclusion that the prosecution's peremptory challenges of Black jurors were genuinely exercised for the reasons stated rather than on the basis of group bias. We conclude, accordingly, that the trial court did not err in overruling defendant's *Wheeler* objections.

## B. *Testimony of Andrew James*

Defendant advances a number of contentions regarding the testimony of Andrew James. As will be shown, none of these contentions is well founded.

### 1. *Probation Status*

Defendant maintains that the trial court improperly barred the defense from introducing evidence that James was on probation at the time of his testimony or, in the alternative, that if the trial court did not so rule,

defendant's trial counsel rendered constitutionally defective assistance in failing to introduce such evidence.

### a. *Admissibility*

Immediately before James testified, the trial court held a hearing at the prosecutor's request to determine whether the defense would be permitted to impeach James with any of his prior felony convictions. During the hearing, held out of the jury's presence, the trial court ruled that James could be impeached with three of his prior convictions but not with his conviction for possession of heroin, a violation of Health and Safety Code section 11350. Defense counsel then inquired: "Does the prosecutor have any information on the 11350? Whether he's on probation, whether it's pending?" Explaining why he asked, counsel said, "if some negotiated plea that his probation wasn't going to be violated had been entered or some offer made to that extent, it would be impeachable for that purpose." Defense counsel added, "the question, obviously, comes to mind as to whether any negotiated settlement has been made in return for his testimony." The prosecutor denied that James was receiving any consideration for his testimony. There was further discussion about these matters, but no additional motion or ruling. At the conclusion of the hearing, the court stated: "My— the only purpose of this motion is that I don't know of any negotiations, but I am saying he has three impeachable priors."

Defendant would have us construe one of the court's remarks ("Well, if there have been any negotiations in exchange for testimony pending certain charges, you can show that for bias, but I don't know that—") as a ruling barring introduction of evidence that James was on probation at the time of his testimony. We have carefully examined the remark in the context in which it was made and have concluded that the remark did not constitute a ruling of any sort. In brief, the record does not show that the defense was barred from introducing evidence that James was on probation at the time of his testimony.

### b. *Ineffective assistance of counsel*

In the reply brief, defendant argues that if, as we have concluded, there was no ruling barring evidence of James's probation status, then defendant's trial counsel rendered ineffective assistance in failing to introduce such evidence.

A defendant seeking relief on the basis of ineffective assistance of counsel must show both that trial counsel failed to act in a manner to be expected of reasonably competent attorneys acting as diligent advocates,

and that it is reasonably probable a more favorable determination would have resulted in the absence of counsel's failings. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 584 [189 Cal.Rptr. 855, 659 P.2d 1144]; see also, *Strickland* v. *Washington* (1984) 466 U.S. 668, 687-696 [80 L.Ed.2d 674, 693-699, 104 S.Ct. 2052].) If the defendant fails to establish the prejudice component of the ineffectiveness claim, a reviewing court need not determine whether counsel's performance was deficient. (*Strickland* v. *Washington, supra*, at p. 697 [80 L.Ed.2d at p. 699].)

■ Because we conclude that defendant has not shown prejudice, we need not decide whether a reasonably competent attorney would have introduced evidence of James's probation status. James's testimony was not of critical importance to the prosecution's case. Even apart from that testimony, and apart also from defendant's own testimonial admissions, there was compelling evidence that defendant had killed Patel: Patel was seen in defendant's company shortly before the estimated time of his death, his body was found in a room of which defendant was the last known occupant, and defendant's bloodstained clothing was found in the same room. There was also substantial evidence, apart from James's testimony, that defendant killed Patel with the intent to rob him and then proceeded to ransack the motel's office and the manager's living quarters. Defendant demonstrated consciousness of guilt by fleeing the area and giving a false statement when arrested, the knife that killed Patel was found in the manager's living quarters, defendant was seen carrying a box from the office to James's car, and four days later defendant committed similar crimes against James Cross.

In addition, James's credibility was suspect even without evidence of his probation status. An admitted drug user, James was an obvious suspect in the burglary of the manager's office and living quarters, and possibly in the murder as well; he testified under a grant of immunity; and he was impeached with evidence of his prior convictions for petty theft, possession of stolen property, and grand theft from the person. For these reasons, defense counsel's failure to impeach James with evidence of his probation status does not establish ineffective assistance of counsel.

### 2. *Prior Consistent Statement*

■ Defendant also contends that the trial court erred in ruling admissible, under the hearsay exception for prior consistent statements (Evid. Code, §§ 791, subd. (b), & 1236), a statement James had made to law enforcement officers on January 6, 1980. Defendant argues that the statement did not qualify as a prior consistent statement because James already had motives to fabricate when he made the statement and because the prior

statement included material information not mentioned by James during his trial testimony.

A prior consistent statement is admissible to rehabilitate a witness when "[a]n express or implied charge has been made that his testimony at the hearing is recently fabricated or is influenced by bias or other improper motive, and the statement was made before the bias, motive for fabrication, or other improper motive is alleged to have arisen." (Evid. Code, § 791, subd. (b).)

In this case, James was impeached by evidence that criminal charges were pending against him when he testified, the implication being that James might have testified in a manner favorable to the prosecution in the hope of obtaining leniency in the disposition of the pending charges. The prosecution argued, and the trial court ruled, that James's prior statement was admissible to rebut this implication because these charges were not pending against James when the prior statement was made. Defendant asserts that the ruling was error because James had other motives to fabricate when he gave his prior statement, namely, he was then on probation and he was himself a suspect in the murder and robbery of Patel and the burglary of the motel office and the manager's living quarters.

The issue defendant raises is whether, when a witness's testimony may have been influenced by multiple biases or motives to fabricate, a prior consistent statement is admissible if made before the existence of *any one or more* of the alleged biases or motives to fabricate or only if made before the existence of *all* such biases and motives. We addressed this issue in *People* v. *Andrews* (1989) 49 Cal.3d 200, 210-211 [260 Cal.Rptr. 583, 776 P.2d 285]. In *Andrews*, a witness's prior statement, consistent with his trial testimony, was admitted to rebut a charge that the witness's testimony was influenced by a "deal" he had made with the prosecution four years after the prior statement. We rejected the defendant's contention that admission of the statement was error because the witness had a motive to fabricate when he made the prior statement. We decided, in effect, that a prior consistent statement is admissible if it was made before the existence of any one or more of the biases or motives that, according to the opposing party's express or implied charge, may have influenced the witness's testimony. (See also, *People* v. *Cannady* (1972) 8 Cal.3d 379, 388 [105 Cal.Rptr. 129, 503 P.2d 585]; *People* v. *Duvall* (1968) 262 Cal.App.2d 417, 421 [68 Cal.Rptr. 708].) We conclude, accordingly, that in this case the statement given by James on January 6, 1980, was properly admitted as a prior consistent statement.

Defendant also claims that the prior consistent statement included material not mentioned in James's testimony. Specifically, in the prior statement

James related that defendant had said he "used something" so as not to leave fingerprints in the motel office. During his direct examination, James did not mention this damaging admission by defendant.

The defense raised this issue in the trial court by motion for mistrial after James had completed his testimony. During a hearing outside the jury's presence, the trial court concluded that this portion of the statement had been erroneously but inadvertently included in the evidence admitted as a prior consistent statement. James then testified, out of the jury's presence, that defendant had said either that he "used something" to avoid leaving fingerprints or that he was not worried about leaving fingerprints in the motel office. The trial court noted that any error in admitting this portion of the prior consistent statement could be cured by having James testify before the jury that defendant had in fact made this statement; the court assumed the defense would prefer not to have the damaging admission emphasized in this manner. Defense counsel agreed he "did not want that reemphasized to the jury." The trial court denied the motion for mistrial.

■ A ruling on a motion for mistrial is reviewed under the deferential abuse-of-discretion standard. (*People* v. *McLain* (1988) 46 Cal.3d 97, 113 [249 Cal.Rptr. 630, 757 P.2d 569].) ■ Applying that standard, we find no abuse of discretion. When evidence of James's prior consistent statement was received, defendant failed to make a timely and specific objection that the portion of it now challenged was inadmissible. Moreover, as the trial court concluded, any error could have been cured by having James testify to this damaging admission by defendant. To avoid placing undue emphasis on this inculpatory evidence, defense counsel reasonably elected not to insist that James give such testimony to the jury.

■ Defendant also contends that admission of James's prior consistent statement violated defendant's right of confrontation under the Sixth Amendment of the federal Constitution. We disagree. The Sixth Amendment right to confront witnesses does not forbid the use of prior out-of-court statements by a declarant who testifies at trial and is subject to full cross-examination in regard to the prior statement. (*California* v. *Green* (1970) 399 U.S. 149, 153-164 [26 L.Ed.2d 489, 494-500, 90 S.Ct. 1930]; see *People* v. *Chavez* (1980) 26 Cal.3d 334, 349-361 [161 Cal.Rptr. 762, 605 P.2d 401].)

3. *Evidence of Pending Charges*

■ When he testified at defendant's trial, James had charges pending against him in two cases. The first case involved two counts of petty theft with a prior petty theft conviction (§ 666); in both counts the offense, which

could be charged as either a felony or a misdemeanor, was charged as a felony. ▆ ▆▆▆ In the second case, James was originally charged with petty theft with a prior petty theft conviction (§ 666), charged as a misdemeanor, and with the misdemeanor offenses of being under the influence of heroin or morphine (Health & Saf. Code, § 11550) and possession of narcotics paraphernalia (*id.*, § 11364); this complaint was amended, however, on the day it was filed, to elevate the petty theft charge to a felony and to add a count, as an alternative to the petty theft count, charging the felony offense of burglary (§ 459).[3]

▆ During cross-examination, defense counsel asked James whether he had charges pending against him for three felony counts of petty theft with a prior. James said he did not believe there were that many counts. Defense counsel then had marked for identification the complaints in the two cases. In the second case, however, the complaint marked as a defense exhibit was the original rather than the amended complaint. The two defense exhibits were later received in evidence.

Based on these facts, defendant contends that the prosecutor committed misconduct either in failing to disclose the amended complaint or, assuming that the complaint was disclosed, in failing to correct defense counsel's mistake in submitting as an exhibit the original instead of the amended complaint. In the alternative, he argues that counsel rendered ineffective assistance in introducing the superseded complaint.

### a. *Prosecutorial misconduct*

▆ Under the due process clause of the Fourteenth Amendment to the United States Constitution, the prosecution has a duty to disclose all substantial material evidence favorable to an accused, including evidence bearing on the credibility of a prosecution witness; the duty exists whether or not the evidence has been requested, and it is violated whether or not the failure to disclose is intentional. (*People* v. *Morris* (1988) 46 Cal.3d 1, 29-30 [249 Cal.Rptr. 119, 756 P.2d 843].)

▆ The record in this case does not indicate whether the prosecution disclosed the amended complaint to the defense, although an inference that

---

[3] The amended complaint is not part of the appellate record, but defendant has furnished us with a copy, as an exhibit to his appellate brief, and has requested that we take judicial notice of it. (See Evid. Code, §§ 459, subd. (a) & 452, subd. (d).) The People have questioned the relevance of the document but do not dispute that it is authentic or that it is a proper subject of judicial notice. Because the amended complaint is a proper subject of judicial notice and pertinent to an issue raised an appeal, we grant the request for judicial notice. (See *People* v. *Belcher* (1974) 11 Cal.3d 91, 94, fn. 2 [113 Cal.Rptr. 1, 520 P.2d 385]; *People* v. *Jurado* (1981) 115 Cal.App.3d 470, 482 [171 Cal.Rptr. 509]; *People* v. *Terry* (1974) 38 Cal.App.3d 432, 439 [113 Cal.Rptr. 233].)

defense counsel was aware of the amended complaint might be drawn from a question that defense counsel put to James ("Isn't it a fact that you've got *three felony* petty thefts with a prior charge[s] pending in Municipal Court right now?" [italics added]), and from defense counsel's reference to these charges in closing argument ("[James] exercised what he knew was his carte blanc [*sic*] to commit . . . three felonies and a couple of high misdemeanors after he went and talked to the police."). Nevertheless, we may assume for purposes of argument that the prosecution should have noticed that the exhibit introduced by the defense was a superseded complaint and that it should have directed defense counsel's attention to the amended complaint.

Failure to disclose evidence relevant to the impeachment of a prosecution witness requires reversal "only if the evidence is material in the sense that its suppression undermines confidence in the outcome of the trial." (*United States* v. *Bagley* (1985) 473 U.S. 667, 678 [87 L.Ed.2d 481, 491, 105 S.Ct. 3375].) Otherwise stated, reversal is required "only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." (*Id.* at p. 682 [87 L.Ed.2d at p. 494].)

There is no such reasonable probability in this instance. The jury knew that James had been granted immunity in this case and that he had a number of charges pending against him, including two misdemeanor drug offenses and three petty theft offenses. And the jury knew that two of the petty thefts were charged as felonies. Given this strong impeachment evidence, we are persuaded that the jury's verdict would not have been affected by knowledge that the third petty theft offense was also charged as a felony, rather than a misdemeanor, and that James was also charged with burglary as an alternative to one of the petty theft counts.

### b. *Ineffective assistance of counsel*

As we have previously stated, a claim of constitutionally inadequate representation requires proof of two components, deficient performance and resulting prejudice, but the former component need not be examined if prejudice is not shown. (*People* v. *Fosselman, supra,* 33 Cal.3d at p. 584; *Strickland* v. *Washington, supra,* 466 U.S. at pp. 687-697 [80 L.Ed.2d at pp. 693-699].) Because we have already concluded there is no reasonable probability that introduction of the amended complaint would have resulted in a verdict more favorable to defendant, we reject this claim of ineffective assistance of counsel.

### 4. *Nonprosecution of Pending Charges*

As noted above, James had charges pending against him at the time of his testimony in this case. Those charges were filed in January and

February of 1980, but proceedings to arraign James on the charges were continued repeatedly during the pendency of this case; within days after the jury returned its verdict of death against defendant, the prosecution requested and obtained dismissal of all James's pending charges. Despite the prosecutor's representations in this case that no promises had been made to James regarding the disposition of his pending charges, and despite James's testimony to that effect, defendant now argues that the prosecutor must have somehow communicated to James or his attorney that the charges would be dismissed, and that the prosecutor's failure to disclose this communication to the defense was misconduct.[4] In the alternative, defendant contends that his counsel rendered ineffective assistance in failing to discover the alleged inducement.

### a. *Prosecutorial misconduct*

The timing of the dismissals of charges against James is suggestive and may support an inference that they were a reward to James for his testimony in this case. Yet for defendant to prevail, he must show not only that a reward or consideration was given, but also that the prosecution somehow led James or his counsel to anticipate that such a reward would be forthcoming. The only possible evidence of this is the fact that the charges were allowed to remain pending, without arraignment, for almost two years. James may have inferred from the nonprosecution of the charges that they might eventually be dismissed, but this hardly amounts to an implied agreement, and these facts were, in any event, fully disclosed to the defense and the jury. Apart from the nonprosecution, there is no evidence of any agreement or understanding, express or implied, that the charges against James would be dismissed, and we decline defendant's invitation to bridge this void by speculation. Defendant has failed to show the existence of an undisclosed agreement or understanding that James's testimony would result in the dismissal of the charges pending against him.

### b. *Ineffective assistance of counsel*

Defendant contends that his trial counsel's performance was deficient because counsel failed to discover the existence of the prosecution's agreement or understanding with James as to the disposition of James's pending charges. But, as we have seen, the appellate record does not establish the

---

[4]The prosecution's failure to disclose an alleged deal with James concerning his pending charges was one of the issues raised by defendant in a petition for writ of habeas corpus. We issued an order to show cause on this and other issues raised by the petition. On May 18, 1989, however, we vacated the order as improvidently granted and denied the petition on the merits.

existence of any such agreement or understanding. We therefore reject the claim of ineffective assistance of counsel as factually unsupported.

## 5. *Prior Convictions*

As previously noted (*ante*, p. 607), out of the jury's presence the trial court held a hearing at which it determined that James could be impeached with three prior felony convictions. Those convictions were for the offenses of petty theft with a prior petty theft conviction (§ 666), grand theft from the person (§ 487, subd. 2), and receiving stolen property (§ 496). The prosecutor elicited testimony from James that he had been convicted of these offenses; but when asked whether they were felony convictions, James replied, "Not that I know of." Under questioning by defense counsel, James gave the testimony set out in the margin,[5] in which he: (1) accepted defense counsel's representation that the petty theft conviction was a felony conviction; (2) acknowledged that he had been convicted of receiving stolen property as a felony but then, in the next answer, said he did not think it was a felony; and (3) said he did not know whether grand theft from the person was a felony. No further evidence was received as to these convictions. The trial court instructed the jury, in the language of CALJIC Nos. 2.20 and 2.23 (4th ed. 1979; all references to CALJIC instructions are to this edition unless otherwise stated), that one of the things it could consider in assessing the credibility of a witness was whether or not the witness had previously been convicted of a felony.

Defendant maintains that his trial counsel rendered ineffective assistance in failing to offer evidence to establish beyond doubt that each of James's three prior convictions was a felony conviction. We agree that reasonably competent counsel, performing as a diligent advocate, would have offered evidence, or obtained a stipulation or instruction, that the convictions in question were felony convictions. There could be no valid tactical basis for not doing so. We are not persuaded, however, that counsel's omission was

---

[5] "Q. Well, do you remember a petty theft with a prior conviction of petty theft that you were convicted of in 1979? You pled guilty to it in 1979.
"A. I had a prior conviction, yeah, I think so, but it—I don't know—is that a felony?
"Q. Yes. Were you convicted of receiving stolen property, a felony in this jurisdiction?
"A. Yes.
"Q. And that was a felony?
"A. No, I don't think so.
"Q. Okay. Were you convicted of grand theft from the person in 1977?
"A. Well, that was altogether. I think I had pleaded guilt to about four charges on that . . . .
"Q. And one of those charges was grand theft from the person, right?
"A. Yeah.
"Q. Okay. A felony?
"A. I don't know."

prejudicial. The jury did learn of each of James's three prior convictions and knew at least that they might be felony convictions. As we discussed earlier, James's testimony was not of critical importance to the prosecution's case and his credibility was substantially attacked by the defense.

### 6. *Evidence of "Street Threat"*

Under direct examination, James was asked about payments he had received. He testified that he had received $300 in government funds under the State Witness Protection program. Asked to explain how that had come about, James said: "I told them what jumped off, you know. I guess the word got in the street and so forth and the District Attorney's department, I guess—well, it was best for me to leave there, so they gave me some money to go—I went to San Diego and stayed a while." On cross-examination, defense counsel brought out that James had gone to San Diego shortly after he was assaulted and beaten by the brother of one Terry Williams. James explained that Williams was then incarcerated on a murder charge, that Williams's mother had given James some clothing that Williams had planned to wear at his trial but had found to be too small, that James had agreed to sell the clothing and buy clothing in Williams's size, and that James's failure to complete this task may have been the motive for the beating.

Defendant contends his counsel should have objected to all questions about the reasons for placing James in the State Witness Protection program, because the jury could have construed the testimony regarding "the word . . . in the street" as evidence that defendant had threatened James and thereby demonstrated consciousness of guilt. Counsel's decision not to object was a reasonable tactical decision. Evidence that James was receiving government funds and other assistance had significant impeachment value, and the evidence regarding the motive for placing James in the program permitted the defense to bring out on cross-examination that James was acquainted with another murder suspect and had apparently stolen that individual's clothing. In exchange for this valuable impeachment evidence, the damage to the defense case was slight and speculative. The reference to the "word . . . in the street" was fleeting and ambiguous and was not tied to defendant. Although defendant characterizes the testimony as the "street threat" evidence, there was no testimony regarding any threat. The "word . . . in the street" could refer merely to common knowledge in the community that James was testifying as a prosecution witness in a murder case. This knowledge would be sufficient to make life uncomfortable and dangerous for James in the culture of drug use and property offense to which he evidently belonged. Accordingly, defense counsel's failure to object did not constitute ineffective assistance of counsel.

## C. *Testimony of James Cross*

### 1. *Admissibility*

■ Defendant contends the trial court erred in allowing the prosecution to introduce evidence of the crimes defendant had committed against James Cross (hereafter the Cross offenses). Defendant argues that a pretrial ruling granting a motion to sever conclusively determined that evidence of the Cross offenses was inadmissible in the trial of the capital charges. He also argues that evidence of the Cross offenses should have been excluded under sections 352[6] and 1101[7] of the Evidence Code. None of these arguments is persuasive.

Generally, pretrial rulings on the admissibility of evidence are not binding on a trial court. (See *People* v. *Superior Court (Zolnay)* (1975) 15 Cal.3d 729, 734 [125 Cal.Rptr. 798, 542 P.2d 1390]; *People* v. *Beasley* (1967) 250 Cal.App.2d 71, 77 [58 Cal.Rptr. 485].) Defendant has advanced no persuasive reason, and has submitted no persuasive authority, for establishing an exception under which a ruling granting severance would deprive a trial court of authority to determine the admissibility of evidence of offenses charged in severed counts. Moreover, even if the court that ruled on the severance motion in this case had possessed authority to make a binding determination on the admissibility of evidence, the record shows that the court did not do so. When it granted the severance motion, the court expressly stated that it was *not* determining whether evidence of the Cross incident would be admissible in the trial of the capital charges. Therefore, the trial court did not err in concluding that the ruling on the severance motion did not determine the admissibility of evidence of the Cross offenses.

■ Evidence that a defendant committed crimes other than those for which the defendant is then being tried is barred by Evidence Code section

---

[6] "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (Evid. Code, § 352.)

[7] "(a) Except as provided in this section and in Sections 1102 and 1103, evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, or evidence of specific instances of his or her conduct) is inadmissible when offered to prove his or her conduct on a specified occasion. [¶] (b) Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act. [¶] (c) Nothing in this section affects the admissibility of evidence offered to support or attack the credibility of a witness." (Evid. Code, § 1101.)

1101 (see fn. 7, *ante*) if it is offered to prove the defendant's criminal disposition, but not if it is offered to prove a material disputed issue such as motive or intent. (*People* v. *Douglas* (1990) 50 Cal.3d 468, 510 [268 Cal.Rptr. 126, 788 P.2d 640].) The admissibility of other-crimes evidence depends upon "(1) the materiality of the fact sought to be proved or disproved; (2) the tendency of the uncharged crime to prove or disprove the material fact; and (3) the existence of any rule or policy requiring the exclusion of relevant evidence." (*People* v. *Thompson* (1980) 27 Cal.3d 303, 315 [165 Cal.Rptr. 289, 611 P.2d 883], italics omitted.)

A trial court's ruling admitting evidence of other crimes is reviewable for abuse of discretion. (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1239 [270 Cal.Rptr. 451, 792 P.2d 251].) ▮ Here, the prosecution offered evidence of the Cross offenses to establish that defendant intended to rob Patel when he assaulted and killed him. Defendant concedes that his intent was a material and disputed issue, and he fails to identify any rule or policy requiring exclusion of the evidence. Basing his argument on the second of the three factors mentioned above, defendant maintains that evidence of the Cross offenses had little or no tendency to prove the relevant facts regarding his intent at the time he killed Patel. We disagree.

There are striking similarities between the two groups of offenses. In each instance, defendant assaulted a male victim in a motel room that defendant was occupying or visiting, the victim was bound with coat hangers, and another room at the motel was searched for property belonging to the victim. These similarities have substantial probative value on a material disputed issue. Defendant's intent when he assaulted and bound Cross was shown by Cross's testimony: to take any money Cross carried with him, to make Cross reveal the location of any money in Cross's motel room, and to take the money from Cross's room. Because he treated Patel in the same distinctive fashion as Cross—luring Patel to a motel room, assaulting him, and binding him hand and foot with coat hanger wire—it is reasonable to infer that defendant had the same intent, namely, to take money and other valuables. The trial court's ruling admitting the evidence was not an abuse of discretion.

▮ In addition, defendant argues that, in denying his motion to exclude the evidence under Evidence Code section 352 (see fn. 6, *ante*), the trial court erroneously failed to make an express finding that the evidence's probative value outweighed its prejudicial effect. Although such an express finding is not required, the record must affirmatively show that the trial court did in fact weigh prejudice against probative value. (*People* v. *Malone* (1988) 47 Cal.3d 1, 21-22 [252 Cal.Rptr. 525, 762 P.2d 1249]; *People* v. *Wright* (1985) 39 Cal.3d 576, 582 [217 Cal.Rptr. 212, 703 P.2d 1106];

*People* v. *Green* (1980) 27 Cal.3d 1, 25 [164 Cal.Rptr. 1, 609 P.2d 468].) A close review of the record in this case shows, however, that the trial court never ruled on defendant's motion under Evidence Code section 352 to exclude evidence of the Cross offenses.

At the outset of trial, the prosecutor agreed not to mention the Cross offenses in opening statement and not to introduce evidence of them during the prosecution's case-in-chief. The matter was discussed again at the conclusion of the prosecution's case-in-chief when defense counsel requested a ruling on the admissibility of the evidence for rebuttal. The trial court remarked that admissibility would depend upon the other evidence in the case and on what the Cross offense evidence was offered to prove. The court also noted the possibility of exclusion under Evidence Code section 352: "There has to be something raised before you can determine whether or not it's admissible and then even if it is admissible, you have to weigh it under 352 standards." Defense counsel acknowledged that admissibility could be tested in two steps: "The question is, would it be relevant to allow the Cross testimony in to prove specific intent. And, of course, the 352 proven it were relevant, would it be so prejudicial as to be precluded?" It was agreed that the court would read Cross's preliminary hearing testimony and the police reports of the incident.

Shortly thereafter, defense counsel made statements, set forth in the margin,[8] which the trial court could reasonably interpret as meaning that the defense was then seeking a ruling only as to the first step, the admissibility of the evidence under Evidence Code section 1101. After reviewing the evidentiary materials regarding the Cross offenses, the court ruled that the evidence was admissible under Evidence Code section 1101. ("And the Court is going to find that the Cross evidence would have substantial probative value in the issues under 1101, motive, intent and possibly identity of the defendant as it relates to the Patel homicide.") Nothing in the record indicates that the court ruled on an objection under Evidence Code section 352 or that defense counsel then requested a ruling on such an objection. The court might reasonably have concluded that the defense was reserving this objection until after it had presented its case, when the court would be

---

[8] As the court was discussing a case in which evidence was ruled inadmissible under Evidence Code section 1101, defense counsel interjected: "Exactly, and that's what I'm asking for as a preliminary ruling in this case. In other words, after the Court reads the Cross case, is it relevant to prove intent in this case based on the circumstances of this case?" The court stated it intended to read the materials regarding the Cross offenses "to see if the circumstances I know so far from this case from the testimony and the circumstances of the Cross case would meet that—that's only one of the requirements for admissibility, is similarity of the offenses to show the intent is the same at both times." Defense counsel responded, "Right, but it's a threshold requirement . . . . In other words, if the Court says they haven't met that, then the 352 problem never arises." The court answered, "That's correct."

in a better position to balance potential prejudice against probative value. In any event, assuming defense counsel made an objection under Evidence Code section 352, counsel's failure to obtain a ruling is fatal to defendant's appellate contention, for a party objecting to the admission of evidence must press for an actual ruling or the point is not preserved for appeal. (*People* v. *Jacobs* (1987) 195 Cal.App.3d 1636, 1650-1651 [241 Cal.Rptr. 550]; *People* v. *Alaniz* (1986) 182 Cal.App.3d 903, 907 [227 Cal.Rptr. 575]; see 3 Witkin, Cal. Evidence (3d ed. 1986) § 2030, pp. 1992-1993.)

## 2. *Ineffective Assistance of Counsel*

Defendant contends that his trial counsel provided ineffective assistance in his handling of the Cross evidence by (1) failing to object to evidence that defendant threatened to kill Cross; (2) agreeing that Cross could testify as a rebuttal witness; and (3) failing to question Cross about his drinking.

Defendant maintains that evidence of his threat to kill Cross ("You Goddamn M-F, don't you believe I kill you?") was irrelevant to establish intent or, in any event, was more prejudicial than probative, and therefore his trial counsel's failure to object to the evidence and obtain its exclusion demonstrates counsel's incompetence.

Cross's testimony permitted the jury to draw certain reasonable inferences regarding defendant's intent. After a search of Cross's room by defendant's companion failed to locate any money, defendant did not give up. In a final attempt to make Cross reveal the location of additional money, defendant threatened Cross with death and emphasized the threat by firing across his body into the floor. Defendant's use of threat and violence in an effort to make his bound captive disclose the location of additional money for defendant to steal had substantial probative value on the issue of defendant's intent four days earlier, when he bound Patel in identical fashion. A motion to exclude the evidence under Evidence Code section 352 as being more prejudicial than probative would have had little chance of success. Trial counsel's failure to seek exclusion of the evidence does not demonstrate ineffectiveness.

During jury selection the defense moved to exclude Cross's testimony. It was agreed that the evidence would be admissible, if at all, only during rebuttal. The trial court ruled the evidence admissible shortly before the prosecution rested its case-in-chief. Defendant contends trial counsel should have insisted that the evidence be received during the case-in-chief rather than in rebuttal so that it would not be the last evidence the jury heard.

Preventing the prosecution from using Cross's testimony during its case-in-chief allowed defendant to testify regarding the charged offenses without having to explain his conduct in the Cross incident. From the absence of surrebuttal evidence it is fair to infer that defendant had nothing to say about this incident that would have been helpful to his own cause. Had Cross testified during the prosecution's case-in-chief, and had defendant simply ignored the Cross incident in his own testimony, cross-examination would have been barred as outside the scope of the direct examination, but defendant's failure to address an important part of the prosecution's case-in-chief would have left a bad impression on the jury. Also, by excluding the evidence from the prosecution's case-in-chief, the defense barred mention of it during the prosecutor's opening statement and gave the trial court more time to rule on the motion to exclude. We conclude, accordingly, that the agreement to allow the Cross evidence to be used only in rebuttal was a tactical choice within the reasonable range of effective representation.

Cross testified that he returned to his motel room from a bar across the street. Relying on Cross's preliminary hearing testimony that he had consumed two or three beers at the bar during a period of four to five hours, defendant argues that his counsel should have questioned Cross at trial about his drinking. Defendant asserts that evidence showing Cross was intoxicated would have supported an inference that he provoked defendant by belligerent behavior. The argument rests on speculation. Cross's preliminary hearing testimony does not support an inference that he was intoxicated, much less belligerent, and defense counsel could reasonably conclude, after observing Cross testify, that suggesting he had provoked defendant would be implausible and would only antagonize the jury.

### D. *Ineffective Assistance of Counsel*

In addition to the claims already discussed, defendant makes these ineffective assistance claims about his trial counsel's performance: (1) counsel should have impeached Bearla Mae Wyatt with evidence of a prior inconsistent statement; (2) counsel should have objected to evidence of Patel's character; (3) counsel should have objected to evidence of defendant's heroin addiction; and (4) counsel adopted a defective strategy that resulted in the presentation of useless defenses and the withdrawal of the only viable defense.

### 1. *Testimony of Bearla Mae Wyatt*

Bearla Mae Wyatt testified to a conversation she had overheard between defendant and Patel in the motel office on the morning that Patel was killed. On direct examination she said there had been no argument and

no harsh words. Defense counsel asked on cross-examination whether Patel had said to defendant, "You're not even supposed to be here, you don't have a room." Wyatt answered that Patel had not said anything like this, but that he did tell defendant it was defendant's sister's room. During a hearing in chambers, counsel said Wyatt had told him, during an interview that morning, that Patel had said to defendant, "It's your sister's room, you're not supposed to be here." Wyatt again denied that Patel had said this. According to her in-chambers testimony, Patel said, "It's not your room, it's your sister's room." Wyatt reaffirmed there had been no harsh words, and said that what Patel had probably meant was, "why are you worried about it [the sink] being fixed, . . . you don't live here." Defense counsel did not pursue the matter further when proceedings resumed before the jury.

Defendant argues that Wyatt's in-chambers testimony was significantly more favorable to the defense than her previous testimony in open court. Therefore, defendant asserts, his counsel should have had Wyatt repeat the testimony when proceedings resumed before the jury, or if she was unwilling to do so, counsel should have impeached her with evidence of her in-chambers statement. Defendant's argument rests on a defective premise. Whether Patel said, "It's not your room, it's your sister's room" or only the latter part of this statement ("It's your sister's room") was not significant and could not conceivably have affected the jury's verdict. Defense counsel's failure to elicit the full statement, at the risk of appearing to badger the witness over a trifle, does not demonstrate incompetence.

### 2. *Evidence of Victim's Character*

■ The prosecutor asked Barbara Lord how Patel had treated her. She replied that he was a "fairly nice person." The prosecutor asked Michele Gebert whether Patel was "pretty good about letting [her] slide on the rent." She answered, "Yes, he was a good man." Defendant maintains that this was inadmissible character evidence (see Evid. Code, § 1101) and that his counsel's failure to object to these questions, and to move to strike these answers, constituted ineffective assistance.

Whether to object to inadmissible evidence is a tactical decision; because trial counsel's tactical decisions are accorded substantial deference (*In re Cordero* (1988) 46 Cal.3d 161, 180 [249 Cal.Rptr. 342, 756 P.2d 1370]; *People* v. *Ledesma* (1987) 43 Cal.3d 171, 216 [233 Cal.Rptr. 404, 729 P.2d 839]), failure to object seldom establishes counsel's incompetence. (*People* v. *Sheldon* (1989) 48 Cal.3d 935, 951 [258 Cal.Rptr. 242, 771 P.2d 1330]; *People* v. *Adcox* (1988) 47 Cal.3d 207, 261 [253 Cal.Rptr. 55, 763 P.2d 906].) To establish ineffective assistance, a defendant must show that

counsel's actions "fell below an objective standard of reasonableness under prevailing professional norms." (*People* v. *Ledesma, supra,* at p. 216, internal quotation marks and punctuation omitted.)

In this instance, counsel could have reasonably determined that there was no tactical advantage in objecting to the prosecutor's relatively innocuous questions. We note that when the prosecutor asked Andrew James whether Patel was "the sort of person" who would have "swung on" defendant, defense counsel did object and the objection was sustained. The prosecutor's question to James directly implicated the credibility of defendant's version of the circumstances of Patel's death, and thus carried a risk of prejudice to defendant's case that was significantly greater than the more general questions regarding Patel's character posed to Lord and Gebert.

3. *Evidence of Defendant's Heroin Addiction*

One of the witnesses called by the defense was a police officer who was stipulated to be an expert "in the area of narcotics usage and under the influence." He testified that when defendant was arrested on December 27, 1979, there were fresh needle marks on defendant's arm and defendant appeared to be under the influence of an opium derivative, probably heroin. Under another stipulation, the prosecutor was permitted to question the officer as a prosecution witness immediately, rather than recalling him on rebuttal. As a prosecution witness, the officer testified that defendant was probably addicted to heroin and that the cost of the addiction "could be as much as $100 a day or something like that." Defendant contends trial counsel should have objected to this testimony on the ground that the expert did not have an adequate factual basis for his opinion. He argues that the testimony was devastating because it provided a motive for the robbery of Patel.

To be admissible, an expert's opinion must be based on matter "that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates." (Evid. Code, § 801, subd. (b).) Here, the officer conceded that needle marks do not reveal the strength of the drug being injected, and for this reason it is difficult to determine from needle marks alone whether a heroin user is addicted and, if so, the quantity of heroin the user needs to take to avoid withdrawal symptoms. Defendant contends that this concession establishes the inadmissibility of the officer's opinion that defendant was a heroin addict with a habit costing $100 daily. (Cf. *People* v. *Thomas* (1977) 19 Cal.3d 630, 635 [139 Cal.Rptr. 594, 566 P.2d 228].) But the officer's opinion may not have been based on the needle marks alone: defendant was under the influence when the officer observed him and his general condition may have furnished

additional and sufficient grounds for the officer's opinion. (Cf. *People* v. *Benedict* (1969) 2 Cal.App.3d 400, 404-405 [82 Cal.Rptr. 759].)

In any event, we need not determine whether the officer's opinion testimony would have been admissible had an objection been made. As we have observed, reviewing courts accord substantial deference to a tactical decision by trial counsel not to object to the admission of evidence. (*People* v. *Sheldon, supra,* 48 Cal.3d 935, 951; *People* v. *Ledesma, supra,* 43 Cal.3d 171, 216.) Here, the defense strategy was to use evidence of defendant's heroin and Ritalin ingestion to explain his conduct in fatally wounding and binding Patel. Although the strategy did not require proof that defendant was addicted to heroin, or that maintaining his habit cost $100 daily, defense counsel could reasonably determine that evidence of these facts could not be excluded. Had these facts not been proven by the officer's expert testimony, the prosecution might have been able to prove them by other means. On the present record, we are unable to say that defense counsel's failure to object was not a tactical decision within the reasonable range of effective representation.

### 4. Defense Strategy

■ Defendant maintains that his counsel's overall strategy was defective and resulted in the withdrawal of the only viable defense, which was that defendant's killing of Patel was justified by his right of self-defense. Although the trial court instructed the jury on self-defense, this theory was effectively withdrawn by defense counsel in argument to the jury when he conceded that defendant's lethal response to Patel's provocative acts, as related by defendant's testimony, was unreasonable and unnecessary. In place of self-defense, counsel argued that the killing of Patel was an irrational act motivated by anger or unreasonable fear, or both, but not by an intent to rob, and that defendant acted irrationally because he was suddenly awakened by a slap to the face after not sleeping for three days and after having ingested both heroin and Ritalin.

Defendant contends counsel's strategy was useless and self-defeating for these reasons: (1) evidence that defendant had previously been arrested on Patel's complaint supplied a motive for premeditated murder; (2) evidence that defendant was a user of both heroin and Ritalin exposed him to the jury's contempt and loathing; (3) evidence of defendant's heroin usage provided a motive for robbery; (4) defendant's testimony that he was "feeling normal" precluded any defense based on his drug use; and (5) the strategy required that counsel argue against the credibility of defendant's testimony.

We note initially that defense counsel's strategy was not precluded by defendant's testimony that he was "feeling normal." Defendant gave that

testimony in answer to questions by the prosecutor about defendant's heroin use and whether he was experiencing withdrawal symptoms. The testimony did not address the effects of Ritalin or lack of sleep, nor was it intended as a general characterization of defendant's mental condition when he killed Patel.

In any event, the demonstrated risks and disadvantages of defense counsel's strategy do not establish that counsel was incompetent for adopting it. Rather, the risks and disadvantages must be considered in light of the available alternatives. As counsel recognized, the theory of self-defense had little chance of success in light of the victim's many stab wounds, the absence of serious injury to defendant, the binding of the victim with coat hangers, and defendant's flight from the scene without attempting to summon assistance for the victim. Acquittal of all charges was out of the question; moreover, counsel's first priority undoubtedly was to avoid the death penalty. To do this, counsel had to establish above all that defendant did not have the intent to rob when he killed Patel. To this end, counsel introduced evidence that Ritalin can cause aggressive and paranoid behavior, that defendant was a known drug user, that defendant had not slept in three days and may have been difficult to wake, and that defendant's prior arrest may have caused the victim to treat defendant with suspicion and defendant to respond with anger. The strategy was thus well calculated to lend some credibility to defendant's otherwise implausible account of the killing. Although the strategy virtually precluded acquittal and permitted a murder verdict, it minimized the risk that the jury would find the special circumstances to be true, and it preserved the possibility of a manslaughter verdict. We conclude that defense counsel's choice of strategy was within the reasonable range of attorney competence.

E. *Instructions*

1. *Other-crimes Evidence (CALJIC No. 2.50)*

■■■ To explain the permissible uses of the evidence that defendant had committed the Cross offenses, the trial court instructed the jury in the language of CALJIC No. 2.50, regarding the purposes for which it could consider evidence that defendant had committed crimes other than those charged in this proceeding. Defendant contends the trial court erred in failing to modify the instruction to further specify the permissible uses of the other-crimes evidence.

The instruction as given stated that the jury could consider the other-crimes evidence for the limited purposes of showing "the intent which is a necessary element of the crime charged" and "[a] motive for the

commission of the crime charged." Further, the instruction warned the jury *not* to consider the other-crimes evidence to prove that defendant was a person of bad character or had a disposition to commit crimes.

Defendant argues that evidence of the Cross offenses was relevant to prove that he formed the intent to steal but was not relevant to prove that he formed the intent to kill, and that the only disputed issue regarding intent to steal was whether, assuming defendant rather than James had ransacked the motel office and manager's living quarters, defendant formed the intent to steal before or after he killed Patel. Accordingly, defendant argues, the trial court should have modified the instruction on its own motion to state that the other-crimes evidence could be considered only to prove defendant's motive and intent to steal, and in that regard could be considered only in determining whether defendant formed the intent to steal before or after killing Patel. Defendant asserts that without these modifications the jury was likely to use the evidence of the Cross offenses improperly to prove that he had a violent character and was disposed to commit violent offenses.

Although an instruction more clearly stating the permissible use of the other-crimes evidence would have been helpful (see *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1010 [254 Cal.Rptr. 586, 766 P.2d 1]), defendant has not established that the instruction as given was erroneous, inadequate, or prejudicial. We must assume, contrary to defendant's theory of prejudice, that the jury obeyed the express language of the instruction not to use the other-crimes evidence to establish defendant's character or his disposition to commit crimes. The instruction permitted the jury to consider the evidence only in determining defendant's intent and motive; as we have concluded, the evidence was admissible for these purposes.

### 2. *Formation of Larcenous Intent*

Defendant contends that the trial court erred in refusing to give two jury instructions he requested concerning the formation of larcenous intent. The first instruction stated: "If the intent to take money or property does not arise until after a fatal wound is inflicted, the killing cannot be murder in the perpetration of robbery." The second instruction read: "If the larcenous purpose does not arise until after the force has been used against the victim, there is no 'joint operation of act and intent' necessary to constitute robbery." Defendant maintains that these or similar instructions were essential to explain the required elements of robbery and first degree murder in the commission of a robbery.

We rejected an identical contention in *People* v. *Hendricks* (1988) 44 Cal.3d 635, 642-643 [244 Cal.Rptr. 181, 749 P.2d 836], holding that

CALJIC Nos. 8.21 and 9.10 "adequately cover the issue of the time of the formation of the intent to steal." Those same instructions were given in this case.[9] Because defendant's proposed instructions would merely have elaborated on these general instructions, the trial court's refusal to give them was not error. (*People* v. *Hendricks, supra,* at p. 643.)

### 3. *Immediate Presence*

The trial court instructed the jury in the language of CALJIC No. 9.10 that robbery is "the taking of personal property of another from his person or immediate presence, and against his will, accomplished by means of force or fear." (See fn. 9, *ante.*) During deliberations, the jury requested clarification of the meaning of "immediate presence" as used in this instruction. The court then instructed the jury in these words: " 'Presence' depends upon the circumstances of each case and implies an area with no metes and bounds, and 'immediate' is defined as being near at hand, not far apart or distant. An act of robbery can be said to have occurred in the victim's immediate presence as long as the victim perceived any overt act connected with the commission of the offense. An 'overt act' means any step taken or act committed which goes beyond mere planning to commit a public offense and is done in furtherance to commit the public offense."

Defendant does not challenge the first sentence of the special instruction, which is taken almost verbatim from this court's opinion in *People* v. *Risenhoover* (1968) 70 Cal.2d 39, 50 [73 Cal.Rptr. 533, 447 P.2d 925]. But he maintains that the balance of the special instruction is prejudicially erroneous. We agree.

The generally accepted definition of immediate presence, as stated by the Massachusetts Supreme Court, is that " '[a] thing is in the [immediate]

---

[9] CALJIC No. 8.21, as given, reads: "The unlawful killing of a human being, whether intentional, unintentional or accidental, which occurs as a result of the commission of the crimes of robbery and burglary and where there was in the mind of the perpetrator the specific intent to commit such crime, is murder of the first degree. [¶] The specific intent to commit the robbery and/or burglary and the commission of such crimes must be proved beyond a reasonable doubt."

CALJIC No. 9.10, as given, reads: "Defendant is charged in Count 2 of the information with the commission of the crime of robbery, a violation of Section 211 of the Penal Code. [¶] The crime of robbery is the taking of personal property in the possession of another, from his person or immediate presence, and against his will, accomplished by means of force or fear. [¶] In order to prove the commission of the crime of robbery, each of the following elements must be proved: [¶] 1. That a person had possession of property of some value however slight, [¶] 2. That such property was taken from such person or from his immediate presence, [¶] 3. That such property was taken against the will of such person, [¶] 4. That the taking was accomplished either by force or violence or by fear or intimidation or by both, and [¶] 5. That such property was taken with the specific intent permanently to deprive such person of the property."

presence of a person, in respect to robbery, which is so within his reach, inspection, observation or control, that he could, if not overcome by violence or prevented by fear, retain his possession of it.' " (*Commonwealth* v. *Homer* (1920) 235 Mass. 526, 533 [127 N.E. 517]; accord, *United States* v. *Dixon* (D.C. Cir. 1972) 469 F.2d 940, 944; *Spencer* v. *United States* (D.C. Cir. 1940) 116 F.2d 801, 802 [73 App.D.C. 98]; *People* v. *Bartowsheski* (Colo. 1983) 661 P.2d 235, 244; *State* v. *Campbell* (1941) 41 Del. 342 [22 A.2d 390, 392]; *Head* v. *United States* (D.C.App. 1982) 451 A.2d 615, 624; *State* v. *Glymph* (1977) 222 Kan. 73 [563 P.2d 422, 424]; *Foster* v. *State* (1983) 297 Md. 191 [464 A.2d 986, 998]; *Robertson* v. *Sheriff, Clark County* (1977) 93 Nev. 300 [565 P.2d 647, 648]; *State* v. *Carcerano* (1964) 238 Ore. 208 [390 P.2d 923, 928]; *State* v. *Deso* (1938) 110 Vt. 1 [1 A.2d 710, 712]; *State* v. *Mosley* (1981) 102 Wis.2d 636 [307 N.W.2d 200, 208]; LaFave & Scott, Handbook on Criminal Law (1972) p. 696, fn. 24; Perkins & Boyce, Criminal Law (3d ed. 1982) p. 347.) Thus, the Court of Appeal stated in *People* v. *Bauer* (1966) 241 Cal.App.2d 632, 642 [50 Cal.Rptr. 687], that immediate presence " 'must mean at least an area within which the victim could reasonably be expected to exercise some physical control over [her] property.' " (Quoting from *Spencer* v. *United States, supra*, at p. 802.) Under this definition, property may be found to be in the victim's immediate presence "even though it is located in another room of the house, or in another building on [the] premises." (4 Wharton's Criminal Law (14th ed. 1981) § 473, p. 52, fns. omitted; see also, LaFave & Scott, *op. cit. supra*, § 94, p. 696.)

▪ A taking can be accomplished by force or fear and yet not be from the victim's immediate presence. For example, a person might enter the victim's home and there, by the use of force or fear, compel the victim to reveal the combination of a safe located many miles away in the victim's office. The culprit at the victim's house could then relay the combination to a confederate waiting in or near the office, who could use it to open the safe and take its contents before the victim could reach the office or otherwise interfere with the taking. In such a case, the criminals would have accomplished the taking by force or fear and yet not have taken property from the person or immediate presence of the victim. The perpetrators of the taking would be guilty of several offenses—conspiracy, burglary, assault, and grand theft at the least—but they would not be guilty of robbery as defined in section 211 because the taking would not be from an area over which the victim, at the time force or fear was employed, could be said to exercise some physical control.

▪ As previously stated, the trial court in this case gave a special instruction in response to the jury's request for clarification of the meaning of immediate presence. In relevant part, the instruction stated: "An act of

robbery can be said to have occurred in the victim's immediate presence as long as the victim perceived any overt act connected with the commission of the offense." This instruction permitted the jury to find the "immediate presence" element of robbery if any of the acts mentioned in the general definition of robbery occurred in the victim's presence. In this case, defendant assaulted and killed the victim. The jury could reasonably conclude from the special instruction that the "immediate presence" element was satisfied because the fatal assault was an "overt act connected with the commission of the" robbery and because the fatal assault unquestionably occurred in the victim's presence. The special instruction thus rendered the "immediate presence" element devoid of all independent meaning, making it redundant with the "force or fear" element. For this reason, the special instruction was erroneous.[10]

The error was not cured by the first sentence of the special instruction, which stated that presence "depends upon the circumstances of each case and implies an area with no metes and bounds, and 'immediate' is defined as being near at hand, not far apart or distant." Although not erroneous, this language was not helpful either. It did not explain the "immediate presence" element in terms of a principle, concept or test that the jury could apply to any particular set of facts. Nor could it have prevented the jury from using the special instruction's "overt act" language to form an incorrect understanding of the "immediate presence" element. As no other instruction purported to define the "immediate presence" element of robbery, we conclude that the court misinstructed the jury on this essential element.

Because the jury was misinstructed on an element of the offense of robbery, reversal of the robbery conviction is required unless we are able to conclude that the error was harmless beyond a reasonable doubt. (*People* v. *Hernandez* (1988) 46 Cal.3d 194, 210 [249 Cal.Rptr. 850, 757 P.2d 1013]; *People* v. *Odle* (1988) 45 Cal.3d 386, 414-415 [247 Cal.Rptr. 137, 754 P.2d 184].) We are unable to so conclude. This is not a case in which defendant conceded immediate presence at trial, or in which the jury resolved the same issue against defendant in another context (*People* v. *Sedeno* (1974) 10 Cal.3d 703, 721 [112 Cal.Rptr. 1, 518 P.2d 913]). Nor does the evidence establish immediate presence as a matter of law. The room in which Patel

---

[10] Statements in the following cases inconsistent with this holding are disapproved: *People* v. *Brown* (1989) 212 Cal.App.3d 1409, 1419 [261 Cal.Rptr. 262]; *People* v. *Martinez* (1984) 150 Cal.App.3d 579, 604 [198 Cal.Rptr. 565]; *People* v. *Miramon* (1983) 140 Cal.App.3d 118, 124 [189 Cal.Rptr. 432]; and *People* v. *Wiley* (1976) 57 Cal.App.3d 149, 160-161 [129 Cal.Rptr. 13].

Although language similar to that used in the trial court's special instruction appears also in *People* v. *Lavender* (1934) 137 Cal.App. 582, 591 [31 P.2d 439], it was there used to define the commencement of the offense of robbery (an issue not presented here), rather than the meaning of immediate presence.

was assaulted and killed was stipulated to be 107 feet from the stolen property's location, namely, the motel office and living quarters, and both were on the same motel premises. Under these circumstances, a reasonable finder of fact could conclude either that the property was not so distant as to be beyond the victim's control and protection, or that it was too distant to be in the victim's immediate presence at the time the force was used. Because the issue of immediate presence could reasonably have been decided either way, we are unable to declare that the misinstruction on this element of robbery was harmless beyond a reasonable doubt.

This conclusion requires the reversal of both the robbery conviction and the robbery-murder special circumstance. But because the jury convicted defendant of burglary and found true the burglary-murder special circumstance, we are able to determine from the record that the jurors agreed that defendant was guilty of felony murder in the perpetration of a burglary. (See *People* v. *Hernandez* (1988) 47 Cal.3d 315, 351 [253 Cal.Rptr. 199, 763 P.2d 1289]; *People* v. *Ainsworth* (1988) 45 Cal.3d 984, 1015-1016 [248 Cal.Rptr. 568, 755 P.2d 1017].) Therefore, the validity of the first degree murder conviction is not affected by the misinstruction on one of the elements of robbery.

### 4. *Felony Murder in the Commission of Burglary*

As discussed above, defendant requested a special instruction stating that if he did not form the intent to steal until after he had struck the fatal blow, he was not guilty of first degree felony murder in the commission of a *robbery*. He also argues that the trial court should on its own motion have given a similar instruction stating that he was not guilty of felony murder in the commission of *burglary* if the intent to steal was formed after the fatal blow had been struck.

As we have seen, the instructions given in regard to the offenses of robbery and felony murder in the commission of robbery *or burglary* (fn. 9, *ante*) adequately instructed the jury on the issue of after-formed intent as to the offense of robbery. In particular, the felony-murder instruction stated that a killing was murder of the first degree if it occurred "as a *result* of the commission of the crimes of robbery and burglary and where there was in the mind of the perpetrator the specific intent to commit such crime." (Italics added.) A reasonable juror would necessarily understand from this instruction that defendant was guilty of robbery-murder only if the intent to steal was formed before the fatal blow was struck. We likewise conclude that this same felony-murder instruction, in conjunction with the instruc-

tion defining burglary,[11] adequately informed the jury that defendant was guilty of burglary-murder only if the intent to steal was formed before the fatal blow was struck.

### 5. Lesser Included Offenses

Defendant contends the trial court erred in failing to instruct sua sponte on theft and assault as lesser included offenses of robbery. Because the robbery conviction must be reversed for the instructional error discussed above, we need not and do not address this contention.

### 6. Burden of Proof on "Unreasonable Self-defense"

The trial court instructed the jury in the language of CALJIC No. 8.50 (1980 rev.) that "[w]hen the act causing the death, though unlawful, is done . . . in the honest but unreasonable belief in the necessity to defend against imminent peril to life or great bodily injury the offense is manslaughter" and that "[i]n such a case, even if an intent to kill exists, the law is that malice, which is an essential element of murder, is absent." Defendant contends the court committed prejudicial error by failing to instruct also, sua sponte, that the prosecution had the burden of proof on this issue and that, accordingly, a verdict of manslaughter should be returned if the jury entertained a reasonable doubt whether, in killing the victim, the defendant acted in an honest but unreasonable belief in the necessity of defending himself against imminent peril. As defendant concedes in his reply brief, the trial court did so instruct the jury.

### F. Sufficiency of the Evidence

Defendant raises two issues about the sufficiency of the evidence to support his convictions. He contends there was no substantial evidence to establish the "immediate presence" element of robbery or to establish that the killing occurred as a result of a burglary for purposes of felony murder

---

[11] CALJIC No. 14.50, as given, reads: "Defendant is charged in Count 3 of the information, with the commission of the crime of burglary, a violation of Section 459 of the Penal Code. [¶] Every person who enters any structure of the type shown by the evidence in this case with the specific intent to steal, take and carry away the personal property of another of any value and with the further specific intent to deprive the owner permanently of such property is guilty of the crime of burglary. [¶] It is immaterial whether the intent with which the entry was made was thereafter carried out. [¶] In order to prove the commission of the crime of burglary, each of the following elements must be proved: [¶] 1. That a person entered a structure of the type shown by the evidence in this case without consent of the person in possession, [¶] 2. That at the time of the entry, such person had the specific intent to steal and take away someone else's property, and intended to deprive the owner permanently of such property."

and the burglary-murder special circumstance. Although we have concluded that the robbery conviction must be reversed for instructional error, we must nonetheless assess the sufficiency of the evidence to determine whether defendant may again be tried for this offense. (*Burks* v. *United States* (1978) 437 U.S. 1, 16-18 [57 L.Ed.2d 1, 12-14, 98 S.Ct. 2141]; *People* v. *Memro* (1985) 38 Cal.3d 658, 690 [214 Cal.Rptr. 832, 700 P.2d 446].) ▇ In reviewing the sufficiency of the evidence to support a judgment of conviction, we examine the entire record in the light most favorable to the prosecution, presuming in support of the judgment the existence of every fact the trier could reasonably deduce from the evidence, to determine whether a rational trier of fact could have found the defendant guilty beyond a reasonable doubt. (*People* v. *Jackson* (1989) 49 Cal.3d 1170, 1199-1200 [264 Cal.Rptr. 852, 783 P.2d 211]; *People* v. *Johnson* (1980) 26 Cal.3d 557, 576 [162 Cal.Rptr. 431, 606 P.2d 738, 16 A.L.R.4th 1255].)

▇ Having reviewed the whole record, we are persuaded that a rational trier of fact could have found the "immediate presence" element of robbery to have been proven beyond a reasonable doubt. A rational trier of fact could have found that the property in the motel office and manager's living quarters was in Patel's immediate presence when he was killed in the motel room rented to defendant's sister. The distance between these two locations, which was stipulated to be one hundred and seven feet, was not so great that the manager would necessarily have been unable to see or hear an attempt to break into the office or to return to the office in time to resist such an attempt. Therefore, a rational trier of fact could find that the property in the office remained under Patel's physical control while he was performing various chores in other parts of the motel premises and, in particular, while he was inside the motel room of defendant's sister.

▇ We also reject defendant's claim that the evidence is insufficient to support a conviction of felony murder in the commission of burglary or the finding of the burglary-murder special circumstance. Defendant's argument is based on the erroneous premise that both the felony-murder offense and the special circumstance require proof that the killing occurred during or after the entry into the burglarized premises. ▇ A murder is of the first degree if "committed in the perpetration of, or attempt to perpetrate" any of certain enumerated felonies, one of which is burglary. (§ 189.) Under this provision, a killing is committed in the perpetration of an enumerated felony if the killing and the felony "are parts of one continuous transaction." (*People* v. *Ainsworth, supra,* 45 Cal.3d 984, 1016; *People* v. *Welch* (1972) 8 Cal.3d 106, 118 [104 Cal.Rptr. 217, 501 P.2d 225].) We have indicated that the reach of the felony-murder special circumstance is

equally broad.[12] (*People* v. *Thompson* (1990) 50 Cal.3d 134, 176 [266 Cal.Rptr. 309, 785 P.2d 857]; *People* v. *Guzman* (1988) 45 Cal.3d 915, 949-952 [248 Cal.Rptr. 467, 755 P.2d 917]; see also, *People* v. *Sellers* (1988) 203 Cal.App.3d 1042, 1054 [250 Cal.Rptr. 345].) ▮▮▮ Here, therefore, defendant was guilty of murder in the perpetration of burglary, and the burglary-murder special circumstance was properly found if (1) defendant intended to commit the burglary when he killed Patel, and (2) the killing and the burglary of the motel office and adjoining living quarters were part of one continuous transaction. A rational trier of fact could have so found.

### G. Failure to Instruct on Intent to Kill

▮▮▮ Defendant's crimes were committed and his trial occurred before this court's decision in *Carlos* v. *Superior Court* (1983) 35 Cal.3d 131 [197 Cal.Rptr. 79, 672 P.2d 862], holding that proof of intent to kill or aid a killing was essential to a finding of a felony-murder special circumstance under the 1978 death penalty law. Relying on *Carlos*, defendant contends that the trial court in this case erred in failing to instruct on intent to kill. As defendant now recognizes, we overruled *Carlos* in *People* v. *Anderson* (1987) 43 Cal.3d 1104, holding that a first degree felony murderer who did the actual killing is subject to the death penalty regardless of intent to kill. We have also held that retroactive application of our decision in *Anderson* does not violate defendant's right to due process under the federal Constitution. (*People* v. *Malone, supra,* 47 Cal.3d 1, 25; *People* v. *Poggi* (1988) 45 Cal.3d 306, 326-327 [246 Cal.Rptr. 886, 753 P.2d 1082].) Here, it was undisputed that defendant was the actual killer; an instruction on intent to kill was therefore not required.

Based on the undisputed evidence presented at trial, we conclude that defendant was the actual killer of Patel, thereby establishing a degree of culpability sufficient under the Eighth Amendment to permit defendant's execution. (*People* v. *Murtishaw* (1989) 48 Cal.3d 1001, 1037 [258 Cal.Rptr. 821, 773 P.2d 172], and cases cited therein.)

### III. PENALTY ISSUES

### A. Juvenile Court Admission

▮▮▮ Defendant contends the trial court erred in admitting evidence of his admission in juvenile court proceedings that he had committed the

---

[12] The felony-murder special circumstance (§ 190.2, subd. (a)(17)) requires proof that the murder was committed "while the defendant was engaged in or was an accomplice in the commission of, attempted commission of, or the immediate flight after committing or attempting to commit" certain enumerated felonies, one of which is burglary.

offense of voluntary manslaughter as alleged in a juvenile court wardship petition. He maintains that the evidence was not relevant to any statutory factor in aggravation.

Juvenile court adjudications under Welfare and Institutions Code section 602 are not criminal convictions, and thus are not admissible under section 190.3, factor (c), as prior felony convictions. (*People* v. *Burton* (1989) 48 Cal.3d 843, 862 [258 Cal.Rptr. 184, 771 P.2d 1270].) Here, the evidence of defendant's admission in juvenile court was not offered under factor (c), and the trial court expressly instructed the jury that it was not to be so considered. Rather, the evidence was offered under section 190.3, factor (b), as evidence of "criminal activity by the defendant which involved the use or attempted use of force or violence or the express or implied threat to use force or violence."

Defendant argues that the evidence was inadmissible under factor (b) of section 190.3 because acts by a juvenile are not "criminal activity" unless the juvenile has been shown to be unfit for treatment through the juvenile court system. (See Welf. & Inst. Code, § 707.) We rejected essentially the same argument in *People* v. *Burton, supra,* 48 Cal.3d 843, 862, concluding that evidence of violent criminal misconduct while a juvenile is admissible under factor (b).

Finally, defendant claims that the evidence was insufficient to prove that he was the perpetrator of the offense as opposed to one who merely aided and abetted its commission by nonviolent means. This argument, too, lacks merit. Evidence that a defendant in a capital punishment case has previously aided and abetted a violent criminal offense is admissible under the language of factor (b) of section 190.3, whether or not the defendant's actions were themselves violent: it is evidence of "*criminal activity* by the defendant which *involved* the use . . . of force or violence . . . ." (Italics added.)

B. *Prosecutorial Misconduct*

Defendant contends that various statements made by the prosecutor during his penalty phase argument constituted misconduct. Defendant did not object to any of these statements, nor did he request a curative admonition. ■■■ As defendant recognizes, the failure to object is normally deemed a waiver of the claim of misconduct. (*People* v. *Walker* (1988) 47 Cal.3d 605, 650 [253 Cal.Rptr. 863, 765 P.2d 70]; *People* v. *Green, supra,* 27 Cal.3d 1, 34.) He argues, however, that the various misconduct claims should not be deemed waived because the resulting harm could not have been cured by an admonition (*People* v. *Green, supra,* at p. 34), and because

defense counsel's failure to object constituted ineffective assistance of counsel.

 The first misconduct claim is based on the prosecutor's remark that evidence had been received of a "felony conviction" for the "murder of Raymond Jones." As we have noted, there was no such felony conviction. Defendant had admitted a juvenile court allegation of voluntary manslaughter for the killing of Jones, but evidence of this admission was received under factor (b) of section 190.3 as evidence of prior criminal activity involving violence, not under factor (c) as evidence of a prior felony conviction.

An admonition would have cured any harm caused by the misstatement, and, indeed, defendant received the equivalent of a curative admonition when the court instructed the jury in these words: "The admission by the defendant as a juvenile to a violation of Section 192.1, voluntary manslaughter as it related to Raymond Jones is not a prior felony conviction." Defense counsel knew that the jury would be so instructed and might reasonably conclude that an objection would draw undue attention to the Jones killing. In his argument to the jury, defense counsel was careful to refer to the Jones killing as a manslaughter, not a murder. Under these circumstances, failure to object does not demonstrate ineffective assistance.

 The prosecutor argued to the jury that defendant "pistol-whipped Mr. Cross to the extent he also could have suffered a skull fracture," adding, "it was no credit to the defendant that James Cross didn't die." Defendant charges that these statements were misconduct because they were not fairly based on the evidence and because the trial court had expressly ruled inadmissible all evidence of the severity of Cross's injuries.

A reasonable juror would have understood that the prosecutor's argument was not directed to the severity of the injuries actually suffered by Cross but to the seriousness of defendant's misconduct, his disregard for the health and safety of his victim, and the potential for grave and even fatal injury. The argument was thus directed to proper penalty considerations and it is fairly supported by the record. Cross testified that when defendant hit him across the head with a pistol, "[t]he blow set [him] down" on the bed, and that defendant hit him "several times" across the face and down the side of the head with the pistol.

The prosecutor also said during argument that defendant "was chasing Mr. Soriano with the intent to assault or commit another robbery." Defendant contends this constituted misconduct because there was no substantial evidence that defendant intended to rob Mr. Soriano.

Assuming for the sake of argument there was insufficient evidence to support an argument that defendant intended to rob Soriano, an admonition to disregard the remark would have cured any harm, and thus defendant has waived the point by failure to object. Because the statement was a single isolated remark addressed to an issue that, in the context of all the evidence received in regard to penalty, could not have had a significant impact on the jury's verdict, ineffective assistance of counsel is not demonstrated.

The prosecutor argued to the jury that defendant had "stabbed Melvin Smith numerous times." Defendant contends the remark is not supported by the evidence, which showed only that defendant was one of a group of three men who assaulted Smith, and it was not shown that defendant was still present when Smith was stabbed. We conclude that, as in the other instances, an admonition would have cured any harm, and that defense counsel's failure to object does not establish ineffective representation. Smith testified that he was hit in the head from behind with a brick; that when he turned around he saw defendant and two other men; that he lapsed into a semiconscious state as a result of his head injury; that he was taken somewhere in a car and "dumped out"; and that he discovered he had been stabbed or cut in the arm and hand, requiring many stitches. Significantly, Smith testified that the assault had occurred shortly after a quarrel with defendant over money. When asked if he knew why he was stabbed, Smith replied, without objection, that it was because of a misunderstanding about money he supposedly owed defendant. The jury could reasonably infer that defendant had instigated the assault and stabbing, and defense counsel could reasonably conclude that, given the totality of the evidence regarding defendant's violent behavior, there would be no significant benefit to be gained in disputing whether defendant had personally inflicted the stab wounds.

Defendant contends next that the prosecutor committed misconduct in arguing there was no evidence showing the existence of various factors in mitigation. It is not misconduct to point out in argument that various potentially mitigating factors are not present. (*People* v. *Coleman* (1989) 48 Cal.3d 112, 154-155 [255 Cal.Rptr. 813, 768 P.2d 32].)

Finally, defendant contends it was misconduct for the prosecutor to argue that the death penalty was appropriate and necessary to prevent defendant from committing further acts of violence, and that the prosecutor's argument invited the jury to speculate that defendant might eventually be released if not sentenced to death. There was no misconduct: we have held that argument directed to a defendant's future dangerousness, when based on evidence of the defendant's past conduct rather than expert

opinion, is proper and does not invite speculation as to the defendant's possible release. (*People* v. *Bittaker, supra,* 48 Cal.3d 1046, 1110, fn. 35; *People* v. *Bean* (1988) 46 Cal.3d 919, 951 [251 Cal.Rptr. 467, 760 P.2d 996]; *People* v. *Rich* (1988) 45 Cal.3d 1036, 1123 [248 Cal.Rptr. 510, 755 P.2d 960]; *People* v. *Davenport* (1985) 41 Cal.3d 247, 288 [221 Cal.Rptr. 794, 710 P.2d 861].)

## C. *Ineffective Assistance of Counsel*

We have already considered and rejected defendant's contention that his trial counsel was ineffective for failing to object to certain statements made by the prosecutor during argument. Defendant raises the following additional claims of ineffective assistance of counsel at the penalty phase.

■ One theme of defense counsel's argument was that defendant's violent acts were attributable to his abuse of drugs and alcohol and that therefore these acts would be unlikely to recur in prison, where defendant would not have access to drugs or alcohol. Defendant does not fault this strategy, but he maintains that reasonably competent counsel would have presented more evidence to support it. Although there was evidence that drugs were involved in the offenses against Patel, Green, and Crawford, there was no such evidence as to the offenses against Cross, Jones, Thurston, Soriano, or Smith.

We must reject this argument on the present record, as it rests on speculation. The record fails to disclose what investigation defense counsel performed regarding the circumstances of the crimes against Cross, Jones, Thurston, Soriano, or Smith, or what evidence might have been presented regarding drug use in connection with those offenses, or whether, on balance, that evidence would have been more helpful than prejudicial to the defense.[13] (See *People* v. *Pope* (1979) 23 Cal.3d 412, 426 [152 Cal.Rptr. 732, 590 P.2d 859, 2 A.L.R.4th 1].)

■ Defense counsel challenged the validity of defendant's prior conviction for grand theft from the person (§ 487, subd. 2) of Thurston, on the ground that defendant's guilty plea was not knowing and voluntary. (See *Boykin* v. *Alabama* (1969) 395 U.S. 238 [23 L.Ed.2d 274, 89 S.Ct. 1709]; *In re Tahl* (1969) 1 Cal.3d 122 [81 Cal.Rptr. 577, 460 P.2d 449].) Out of the jury's presence, the trial court held a hearing, at which a transcript of the plea proceedings was received in evidence. After some discussion about the adequacy of the advisement regarding the penal consequences of the plea,

---

[13] The most obvious source of such evidence was defendant himself, but defense counsel might reasonably have concluded that the risk of putting defendant on the stand outweighed the benefits.

the court ruled that the conviction was valid. Defendant now contends his trial counsel should have argued that the conviction was invalid because defendant had not been told that by pleading guilty he would be giving up his right of confrontation.

The transcript of the plea proceeding shows that defendant was advised he had a "constitutional right to cross-examine any witness" who testified against him, and that by pleading guilty he was surrendering this right. Defendant argues, however, that the right of confrontation is broader than the right to cross-examine, and that an advisement and waiver of the right to cross-examine does not constitute an advisement and waiver of the right of confrontation.

Although we have not directly so held, we have indicated that an advisement to a defendant that he or she has the "right to cross-examine" serves as an adequate advisement of the right of confrontation. (*In re Ronald E.* (1977) 19 Cal.3d 315, 323 [137 Cal.Rptr. 781, 562 P.2d 684].) In any event, even assuming for argument's sake that the advisement was inadequate, defendant has not demonstrated that his trial counsel failed to act in a reasonably competent manner. To collaterally attack a judgment of conviction on *Boykin-Tahl* grounds, it is not enough to show an incomplete or otherwise defective advisement; defendants must also allege and prove that, when the plea was entered, they lacked knowledge of, or did not intelligently waive, their constitutional rights. (*People* v. *Sumstine* (1984) 36 Cal.3d 909, 914 [206 Cal.Rptr. 707, 687 P.2d 904]; *In re Ibarra* (1983) 34 Cal.3d 277, 283, fn. 1 [193 Cal.Rptr. 538, 666 P.2d 980]; *In re Ronald E., supra*, at p. 325, fn. 8; *People* v. *Harty* (1985) 173 Cal.App.3d 493, 503 [219 Cal.Rptr. 85].) The present record provides no basis on which to conclude that defendant could have made such a showing. Because it rests on speculation, we must reject this claim of ineffective assistance. (*People* v. *Pope, supra*, 23 Cal.3d 412, 426.)

Defendant also contends that trial counsel should have challenged on various grounds the admissibility of defendant's prior conviction for assault with a deadly weapon (§ 245) on Crawford. As defendant points out, this conviction *followed* the commission of the capital offense and thus did not qualify under factor (c) of section 190.3 as a *prior* felony conviction. (*People* v. *Balderas* (1985) 41 Cal.3d 144, 201-203 [222 Cal.Rptr. 184, 711 P.2d 480].) We have previously noted that a defendant seeking relief on the basis of ineffective assistance of counsel must show both deficient performance and prejudice. Here the jury received uncontradicted evidence, in the form of Crawford's testimony, of the offense against Crawford, and this evidence was properly received under factor (b) of section 190.3. The additional fact that defendant was convicted of the offense "could have added very little to

the total picture considered by the jury." (*People* v. *Morales* (1989) 48 Cal.3d 527, 567 [257 Cal.Rptr. 64, 770 P.2d 244].) Therefore, defendant suffered no prejudice from counsel's failure to object to evidence of the conviction.

As noted, the defense called two witnesses at the penalty phase to testify to defendant's good behavior during a California Youth Authority commitment. Defendant contends that reasonably competent counsel would have presented additional evidence in mitigation. To establish that such additional evidence was available, defendant relies primarily on the probation and sentencing report, which stated that defendant's intelligence was in the low-average range and that most of his immediate family had been convicted of drug offenses. Defendant also suggests that Andrew James could have been called as a character witness.

The jurors observed defendant during his guilt phase testimony and were able to form an impression of his intelligence; expert testimony on this issue would have been of doubtful benefit. Evidence of the criminality of a defendant's family is extremely risky, as its persuasive value in mitigation is questionable and cross-examination may reveal further criminal acts by the defendant. (See *People* v. *Miranda* (1987) 44 Cal.3d 57, 118-123 [241 Cal.Rptr. 594, 744 P.2d 1127].) As for Andrew James, he was a convicted felon and an admitted drug user; it is unlikely that his opinion of defendant's character would have materially assisted the defense, and cross-examination regarding his past dealings with defendant might well have introduced prejudicial material. Moreover, the present record fails to reveal what instructions defendant may have given counsel in regard to penalty phase evidence (see *People* v. *Lang* (1989) 49 Cal.3d 991, 1029-1033 [264 Cal.Rptr. 386, 782 P.2d 627]), or what justification counsel may have had for presenting only the two witnesses. On the present record, we cannot say that counsel's decision was outside the range of reasonably competent assistance.

 Finally, defendant faults trial counsel for failing to make a persuasive penalty phase argument. Although relatively brief, counsel's argument does not demonstrate incompetent assistance. Counsel argued that the death penalty was the most extreme penalty; that it should not be imposed to achieve revenge; that it was not an effective deterrent; that defendant's past crimes were committed as a consequence of his involvement with drugs and alcohol; that evidence had been introduced to show that defendant was a "personable individual," a "constructive force," and "a leader" who had "blossomed" when placed in a structured setting away from drugs; that defendant would adapt to life in prison and would possibly help someone else there; that a sentence of life without parole would mean that defendant

would spend the rest of his life "in a cage, away from society"; and, finally, that a sentence of life without parole would show that the jury had "tempered justice with mercy."

## D. *Instructions*

### 1. *Reasonable Doubt*

 In accordance with *People* v. *Robertson* (1982) 33 Cal.3d 21, 53-55 [188 Cal.Rptr. 77, 655 P.2d 279], the jury was instructed that before it could consider evidence of prior criminal activity involving violence (§ 190.3, factor (b)) "each element of such additional criminal act must be proved beyond a reasonable doubt by the evidence related to it alone." Defendant contends the court erred in failing to add sua sponte that the instruction applied to evidence of the Cross offenses. Defendant contends the instruction was necessary because otherwise the jury might conclude that the reasonable doubt standard applied only to factor (b) evidence received at the penalty phase, and not to such evidence received at the guilt phase.

The instruction was clear on its face and clarification was not required. A reasonable juror would have understood that the reasonable-doubt standard applied to all evidence of criminal activity offered under section 190.3, factor (b). Moreover, Cross's testimony was direct evidence of the elements of the offenses of assault and robbery, and his testimony was uncontradicted and unimpeached. The omission of a clarifying instruction did not prejudice defendant. (See *People* v. *Morales, supra*, 48 Cal.3d 527, 566; *People* v. *Coleman* (1988) 46 Cal.3d 749, 783 [251 Cal.Rptr. 83, 759 P.2d 1260].)

### 2. *Nonviolent Criminal Activity*

 The jury was instructed that "in determining which penalty is to be imposed on the defendant [it] shall consider all of the evidence which has been received during any part of the trial of this case." Defendant contends that this instruction erroneously implied that the jury could consider as an aggravating factor evidence of defendant's prior criminal activity which did not involve the use or threat of force or violence, and that the trial court should have given a clarifying instruction.

 In determining whether instructional error has been established, we review the instructions as a whole to see if the entire charge delivered a correct interpretation of the law. (*People* v. *Garrison* (1989) 47 Cal.3d 746, 780 [254 Cal.Rptr. 257, 765 P.2d 419].) Here, the trial court instructed the jury to "consider, take into account, and be guided by" the

statutory factors. A reasonable juror would understand from this instruction that evidence received at the guilt and penalty phases was to be considered only if it tended to prove one or more of the statutory factors. Further, the trial court instructed the jury that under factor (b) of section 190.3 it could consider "[t]he presence or absence of criminal activity by the defendant which involved the use or attempted use of force or violence or the expressed or implied threat to use force or violence." A reasonable juror would understand that, by negative implication, criminal activity not meeting these requirements was not to be considered in determining penalty. No further clarification was required.

### 3. *Factor (k)*

■ The final factor that the jury was instructed to consider in making its penalty determination was "Any other circumstance which extenuates the gravity of the crime even though it is not a legal excuse for the crime." Because this case was tried before *People* v. *Easley* (1983) 34 Cal.3d 858 [196 Cal.Rptr. 309, 671 P.2d 813], the jury was not instructed that factor (k) of section 190.3 includes also any aspect of defendant's character or background offered by the defense in support of a verdict other than death, nor was this subject addressed by any supplemental ameliorative instruction. For this reason, defendant contends the instructions failed to inform the jury that it could give mitigating weight to his penalty phase evidence that he would adjust satisfactorily to prison life. Defendant's contention requires that we examine the record to determine whether there is a reasonable likelihood that the jury applied the instruction in a way that prevented the consideration of constitutionally relevant evidence. (*Boyde* v. *California* (1990) 494 U.S. 370, __ [108 L.Ed.2d 316, 329, 110 S.Ct. 1190]; see *People* v. *Hamilton* (1989) 48 Cal.3d 1142, 1182 [259 Cal.Rptr. 701, 774 P.2d 730]; *People* v. *Murtishaw, supra,* 48 Cal.3d 1001, 1032; *People* v. *Allison* (1989) 48 Cal.3d 879, 899-901 [258 Cal.Rptr. 208, 771 P.2d 1294].)

During argument to the jury, the prosecutor, immediately after quoting the language of section 190.3, factor (k), said it was right that the jury should consider sympathy for the defendant in determining penalty, provided this was balanced with consideration of the aggravating factors. The prosecutor then proceeded to discuss defendant's character, and in particular the testimony of defendant's penalty phase witnesses. He argued, in substance, that the evidence was not significantly mitigating because it showed that defendant "has the basic physical and mental ability to be a productive person in this society" and yet, "[f]or whatever reason, he chooses not to." The argument of defense counsel, as previously noted, urged the jury to consider the same evidence as tending to show that defendant's problems were caused by drugs and that he would adjust well to

prison. Thus both arguments proceeded on the assumption that the defense evidence was properly before the jury and could be considered to determine whether there were aspects of his character or background warranting imposition of a sentence less than death. We therefore conclude there is no reasonable likelihood that the omission of an expanded factor (k) instruction prevented the jury's consideration of evidence about defendant's character and background.

### 4. *Extraneous Factors*

Defendant contends it was error to instruct the jury on potentially mitigating factors not shown by the evidence. We have consistently rejected this contention. (E.g., *People* v. *Allison, supra,* 48 Cal.3d 879, 906-907; *People* v. *Bonin* (1989) 47 Cal.3d 808, 854 [254 Cal.Rptr. 298, 765 P.2d 460]; *People* v. *Ghent* (1987) 43 Cal.3d 739, 776-777 [239 Cal.Rptr. 82, 739 P.2d 1250].) Defendant provides no persuasive reason to reconsider our conclusion on this issue.

### 5. *Special Circumstances*

Defendant contends the trial court had to instruct the jury that the robbery-murder and burglary-murder special circumstances should be considered together as only one aggravating circumstance. We have previously rejected this contention. (E.g., *People* v. *Jennings* (1988) 46 Cal.3d 963, 989-990 [251 Cal.Rptr. 278, 760 P.2d 475]; *People* v. *Keenan* (1988) 46 Cal.3d 478, 520 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Melton* (1988) 44 Cal.3d 713, 765-767 [244 Cal.Rptr. 867, 750 P.2d 741].) We reject it here also.

### 6. *Penalty Determination*

Defendant raises three contentions regarding the instructions that described how the jury was to make its penalty determination. He contends the jury should have been instructed that (1) a juror should vote for the death penalty only if persuaded that death is the appropriate penalty under all the circumstances, (2) a juror should vote for the death penalty only if so persuaded beyond a reasonable doubt, and (3) if the juror finds the aggravating and mitigating circumstances to be evenly balanced, the juror should vote for the lesser penalty of life without possibility of parole.

The trial court gave this instruction, in the language of CALJIC No. 8.84.2: "After having heard all the evidence and after having heard and considering the arguments of counsel, you shall consider, take into account and be guided by the applicable factors of aggravating and mitigating

circumstances upon which you have been instructed. If you conclude that the aggravating circumstances outweigh the mitigating circumstances, you shall impose a sentence of death. However, if you determine that the mitigating circumstances outweigh the aggravating circumstances, you shall impose a sentence of confinement in the state prison for life without the possibility of parole."

As we have explained many times, this instruction is potentially misleading in two respects. First, the jury might erroneously infer that it could perform the balancing or weighing process in a mechanical fashion by comparing the number of factors in aggravation with those in mitigation, or by an arbitrary assignment of weights to the factors. Second, the jury might fail to understand that a juror is not required to vote for the death penalty unless, as a result of the weighing process, the juror personally determines that death is the appropriate penalty under all the circumstances. To determine whether the jury may have been misled to defendant's prejudice in either respect, we examine the entire record. (See, e.g., *People* v. *Lang, supra,* 49 Cal.3d 991, 1033-1034; *People* v. *Andrews, supra,* 49 Cal.3d 200, 228-229.)

The trial court gave an additional instruction in this case that virtually eliminated any risk that the jury would be misled as to its sentencing discretion or as to the process of penalty determination. The instruction stated: "It is not intended that you should decide the issue [of penalty] by the simple process of counting the factors that may tend to point in the direction of aggravation or mitigation and then decide the question by choosing the side with the greatest number of factors. You may decide that a certain factor or factors are entitled to greater weight than others. The weight to be given to any or all considered factors is entirely within the province of the jury. The final test is not in the relative number of factors, but in the relative weight to which you feel they are entitled."

This instruction significantly reduced the risk of juror misapprehension. First, it expressly told the jury that penalty was not to be determined by a mechanical process of counting, but rather that the jurors were to decide the weight to be assigned to each individual factor and that their considered judgment regarding the weights of the various factors would be the "final test." Second, as we have observed in previous cases, "when jurors are informed that they have discretion to assign whatever value they deem appropriate to the factors listed, they necessarily understand they have discretion to determine the appropriate penalty." (*People* v. *Boyde* (1988) 46 Cal.3d 212, 253 [250 Cal.Rptr. 83, 758 P.2d 25], affd. *sub nom. Boyde* v. *California, supra,* 494 U.S. 370 [108 L.Ed.2d 316]; accord, *People* v. *Lang,*

*supra,* 49 Cal.3d 991, 1034; *People* v. *Hunter* (1989) 49 Cal.3d 957, 987 [264 Cal.Rptr. 367, 782 P.2d 608]; *People* v. *Burton, supra,* 48 Cal.3d 843, 873.)

We have carefully examined the penalty phase arguments of counsel to the jury and find nothing in them that could have caused a reasonable juror to misapprehend the nature of the penalty determination process or the scope of the jury's discretion to determine penalty. We conclude, accordingly, that no reasonable juror could have been misled as to its responsibility and discretion to determine, through the weighing process, whether death or life without possibility of parole was the appropriate punishment for defendant in this case.

■ We have consistently rejected the contention that the beyond-a-reasonable-doubt standard applies to the process of penalty determination (e.g., *People* v. *Marshall* (1990) 50 Cal.3d 907, 936 [269 Cal.Rptr. 269, 790 P.2d 676]; *People* v. *Bell* (1989) 49 Cal.3d 502, 553 [262 Cal.Rptr. 1, 778 P.2d 129]; *People* v. *Andrews, supra,* 49 Cal.3d 200, 232); it therefore requires no further discussion here.

■ The remaining contention is that the trial court should have told the jury what to do if it found the circumstances in aggravation and mitigation to be precisely equal in weight. The contention is based on a misapprehension of the nature of the penalty determination process. At the penalty phase, each juror must determine, through the weighing process, which of the two alternative penalties is the more appropriate. Because the determination of penalty is essentially moral and normative (*People* v. *Rodriguez* (1986) 42 Cal.3d 730, 779 [230 Cal.Rptr. 667, 726 P.2d 113]), and therefore different in kind from the determination of guilt, there is no burden of proof or burden of persuasion. (See *People* v. *Williams* (1988) 44 Cal.3d 883, 960 [245 Cal.Rptr. 336, 751 P.2d 395].) The jurors cannot escape the responsibility of making the choice by finding the circumstances in aggravation and mitigation to be equally balanced and then relying on a rule of law to decide the penalty issue. The jury itself must, by determining what weight to give the various relevant factors, decide which penalty is more appropriate. We find no infirmity in the instructions given.

7. *Reaching a Penalty Verdict Regardless of Consequences*

■ Defendant contends it was prejudicial error to instruct the jury in these words: "Both the People and the defendant have a right to expect you'll conscientiously consider and weigh the evidence and apply the law of the case and that you will reach a just verdict as to penalty regardless of what the consequences of such verdict may be."

At the penalty stage of a capital case, an instruction that the jurors should not consider the consequences of their verdict is potentially confusing and should not be given. (*People* v. *Brown* (1985) 40 Cal.3d 512, 537, fn. 7 [220 Cal.Rptr. 637, 709 P.2d 440].) The error will seldom be prejudicial, however, and we do not find it prejudicial here, for these reasons: "Viewed in context, the instruction can only have been understood to relate to the jurors' duty to render a just verdict without regard to public response. Moreover, as we have explained, the instructions and arguments, viewed as a whole, adequately apprised the jury of its duty to consider all mitigating evidence, and to impose death only if that was deemed the appropriate penalty under all the circumstances." (*People* v. *Keenan, supra,* 46 Cal.3d 478, 518; see also, *People* v. *Jennings, supra,* 46 Cal.3d 963, 991; *People* v. *Wade* (1988) 44 Cal.3d 975, 998-999 [244 Cal.Rptr. 905, 750 P.2d 794].)

### E. *Cumulative Effect of Penalty Phase Errors*

Defendant contends that the cumulative effect of the errors at the penalty phase requires reversal of the judgment of death. We have determined that few penalty phase errors were committed and that none of them, considered individually, warrants reversal. We now conclude, in addition, that they do not require reversal when considered together.

■■■ We further conclude that defendant was not prejudiced at the penalty phase by the guilt phase instructional error that resulted in the invalidity of the robbery conviction and robbery-murder special-circumstance finding. The jury was well aware of the circumstances under which the murder was committed, and nothing occurred during the penalty phase that would have led the jury to place undue emphasis on the invalid conviction or special circumstance finding in reaching its penalty determination. (See *People* v. *Silva* (1988) 45 Cal.3d 604, 633 [247 Cal.Rptr. 573, 754 P.2d 1070].)

### F. *Modification Motion*

■■■ The trial court conducted a hearing on defendant's motion for modification of the verdict of death (§ 190.4, subd. (e)). After listening to arguments from the defense and the prosecution, the court ruled from the bench, denying the motion and giving a detailed statement of reasons for the ruling. A 12-page statement of reasons, substantially identical to the oral statement, was filed on the same day. Defendant argues that these facts compel an inference that the trial court had prepared its written statement of reasons before the hearing, and that the trial court therefore had already decided, before hearing argument, that it would deny the motion.

Defendant contends he was thereby denied the right to meaningful argument on the modification motion.

We may assume for purposes of argument that the trial court had prepared a written statement of reasons in advance of the hearing. This does not mean that the court's views as expressed in the writing were other than tentative or that the argument was a pointless ritual. We find nothing objectionable in the court's studying the merits of a motion in advance of the hearing and reaching a tentative conclusion as to how the motion should be resolved. Indeed, formulating and announcing tentative rulings in advance of argument is a common practice in law and motion matters. Nor do we see anything improper in the court's having reduced its tentative ruling to writing. To do so does not mean that the court is unalterably bound by the writing or that it will not amend or even discard the writing if counsel's arguments persuade the court that its tentative views were incorrect. Nothing in the record indicates that the trial court failed to give due consideration to defense counsel's argument at the hearing. We conclude, accordingly, that defendant was not deprived of meaningful oral argument on the motion to modify the penalty.

## G. *Disproportionate Penalty*

Defendant contends that imposition of the death penalty in this case is disproportionate to his individual culpability and to the punishment imposed on others who have committed similar crimes.

We are not constitutionally required to conduct intercase proportionality review (*Pulley* v. *Harris* (1984) 465 U.S. 37, 51-54 [79 L.Ed.2d 29, 40-43, 104 S.Ct. 871]), and we have consistently declined to do so. (See, e.g., *People* v. *Stankewitz* (1990) 51 Cal.3d 72, 112 [270 Cal.Rptr. 817, 793 P.2d 23]; *People* v. *Lewis* (1990) 50 Cal.3d 262, 285 [266 Cal.Rptr. 834, 786 P.2d 892].)

We do, however, examine the circumstances of cases in which death sentences have been imposed to determine whether the penalty is disproportionate to a defendant's individual culpability. (See, e.g., *People* v. *Jennings, supra*, 46 Cal.3d 963, 995.) Having conducted such an examination in this case, we conclude that the death penalty is not disproportionate. To steal money and cigarettes, defendant took the life of another human being in a deliberate, callous, and brutal fashion; both the trial court and the jury found defendant's claims of provocation not credible; and, finally, the crime was not an isolated incident, but part of an escalating pattern of violence.

### H. *Multiple Punishment Proscription*

In addition to the sentence of death for the capital offense, defendant was sentenced to prison terms for the burglary and robbery offenses. To avoid imposing multiple punishment for an indivisible course of conduct (see § 654; *People* v. *Bauer* (1969) 1 Cal.3d 368, 376 [82 Cal.Rptr. 357, 461 P.2d 637, 37 A.L.R.3d 1398]), the trial court stayed the sentence on the burglary count, but it declined to stay the sentence on the robbery count. As the Attorney General concedes, this was error. (See *People* v. *Milan* (1973) 9 Cal.3d 185, 196-197 [107 Cal.Rptr. 68, 507 P.2d 956]; *People* v. *Lowe* (1975) 45 Cal.App.3d 792, 795 [119 Cal.Rptr. 699]; *People* v. *Mulqueen* (1970) 9 Cal.App.3d 532, 547-548 [88 Cal.Rptr. 235].) Because we are reversing the conviction and sentence for robbery, we need not determine the effect of this error.

## IV. CONCLUSION

The conviction and sentence for robbery, and the robbery-murder special circumstance, are reversed. In all other respects, the judgment is affirmed.

Lucas, C. J., Mosk, J., Broussard, J., Panelli, J., and Eagleson, J., concurred.

ARABIAN, J.—I agree with reversing the robbery conviction and the robbery-murder special circumstance, and with otherwise affirming the judgment. I write to express three concerns.

First, we judicially noticed the court record attached to the appellate brief because of the specific facts of the case. (Maj. opn., *ante*, at p. 611, fn. 3.) Normally, issues based upon facts or documents outside the appellate record must be raised in a habeas corpus proceeding, not on appeal. (E.g., *People* v. *Szeto* (1981) 29 Cal.3d 20, 35 [171 Cal.Rptr. 652, 623 P.2d 213].) This opinion should not be read as blurring the difference between habeas corpus and appeal, or as generally allowing the attachment to appellate briefs of exhibits not part of the appellate record.

Second, I have grave doubts defense counsel was incompetent in his treatment of James's prior convictions. (Maj. opn., *ante*, at p. 614.) Competent counsel could have reasonably believed that *as a practical matter* he had sufficiently made his point to the jury. Appellate courts should not second guess the dynamics between jury and counsel. The finding of incompetence is unnecessary since we find no prejudice. (*Strickland* v. *Washington* (1984) 466 U.S. 668, 697 [80 L.Ed.2d 674, 699-700, 104 S.Ct. 2052]; *In re Fields* (1990) 51 Cal.3d 1063, 1068 [275 Cal.Rptr. 384, 800 P.2d 862].)

Third, I agree there was no error in giving CALJIC No. 2.50. I am not convinced, however, that an instruction expanding upon the standard instruction "would have been helpful." (Maj. opn., *ante*, at p. 625.) In *People v. Edelbacher* (1989) 47 Cal.3d 983, 1010 [254 Cal.Rptr. 586, 766 P.2d 1], cited by the majority, the trial court instructed on how the evidence could not be used, but not on how it *could* be used. That is quite different from this case. Since there is no sua sponte duty to give *any* instruction on other-crimes evidence (*People* v. *Collie* (1981) 30 Cal.3d 43, 63 [177 Cal.Rptr. 458, 634 P.2d 534]), there is certainly no sua sponte duty to rewrite the standard instruction.

Appellant's petition for a rehearing was denied March 13, 1991.