Filed 3/9/22  P. v. King CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

|  |  |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>JASON THOMAS KING,<br><br>    Defendant and Appellant. | G059471, G059476<br><br>(Super. Ct. Nos. 16WF2681, 17HF1387)<br><br>O P I N I O N |

Appeal from a judgment of the Superior Court of Orange County, Julian W. Bailey, Judge.  Affirmed in part and reversed in part.

Robert V. Vallandigham, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, A. Natasha Cortina and Ksenia Gracheva, Deputy Attorneys General, for Plaintiff and Respondent.

Defendant was convicted of burglary. The People's theory was that he entered a mobile home, while a person was present, with the intent to commit larceny. However, the evidence of defendant's intent at the time of entry was slight. According to both defendant (who testified) and the victim, defendant entered the mobile home, announced himself, and when confronted by the victim, said he was looking for a friend. That claim was lent plausibility by the uncontroverted testimony that defendant's friend did live in a nearby mobile home park, and defendant had spent the day working for that friend. After the victim confronted defendant with a bat, some awkward conversation followed, but ultimately defendant left without taking anything. At trial, the People introduced evidence — over defendant's objection — that defendant had pled guilty to petty theft three months prior. The circumstance of that theft was that defendant while at the beach took personal property off of someone's towel. The purported justification for admitting this evidence, ordinarily inadmissible under Evidence Code section 1101, subdivision (a),[1] was that it showed intent. (See Evid. Code, § 1101, subd. (b).) Defendant appealed, arguing that admitting this evidence was prejudicial error.

On appeal, the People agree with defendant and concede that admitting the evidence of the prior guilty plea was prejudicial error.

We will reverse the judgment. There was insufficient similarity between the prior petty theft and the alleged burglary to justify admission under section 1101, subdivision (b). In substance, this amounted to evidence of propensity, precisely the sort of evidence rendered inadmissible under section 1101, subdivision (a). Given the otherwise minimal evidence of defendant's intent upon entering the mobile home, admission of the petty theft plea was prejudicial.

---

[1] All statutory references are to the Evidence Code unless stated otherwise.

FACTS

**1. Testimony of M.D.**

On the afternoon of November 15, 2016, M.D. was reading and watching television in her mobile home. She was in her bedroom when she heard the sliding glass door to her home open. Several minutes later, M.D. heard footsteps around the kitchen area and a man's voice say "hello." M.D. got out of bed and went toward her bedroom door, which was open, and she and defendant nearly ran into each other. Defendant had no shirt on and was wearing shorts covered in dirt. M.D. did not recognize defendant and thought that defendant might know one of her roommates. She told him, "I don't know you," but defendant did not respond. M.D. began screaming, and defendant still did not respond.

M.D. then slammed the door to her room and grabbed a baseball bat. The door immediately opened — whether because it failed to latch shut when being slammed, or because defendant opened it, M.D. did not know. Raising the bat and screaming at defendant, M.D. warned defendant to get out of her house. After first taking a step toward M.D., defendant backed out of the bedroom. While exiting the room, he told her to relax and mentioned that he thought it was somebody else's house, or that he "just had the wrong house."

M.D. followed defendant out of her bedroom and into another room. She continued to yell at him to get out of her house. Defendant did not leave, instead telling M.D. that he wanted to get to know her and that he was thinking of moving into the neighborhood. He was looking at pictures on the wall and speaking in a calm voice. M.D. began screaming and calling her neighbors for help. Defendant told M.D., "Hey, I wouldn't do that. Nobody else needs to get hurt here." He said that he wanted to tell her "all about himself," and told her not to be afraid. He said that he wanted to be friends and that he wanted to get to know M.D. At the same time, defendant was "admiring

3

everything on the walls" next to a pool table. He then began pointing at objects and told M.D. that he was a ghost and was going to haunt her forever. When later asked if she believed defendant was intoxicated, she responded that he seemed "altered."

As defendant eventually moved outside through the sliding glass door, he looked at a knife block in M.D.'s kitchen and laughed. M.D. swung her bat at the knife block, knocking the knives away from him. At that point defendant left the house. M.D. followed defendant outside and saw him get on his bicycle. She then went back inside and called her neighbor and the police. At no point during this incident did defendant attempt to take anything from the house.

A Huntington Beach Police officer who received a radio call about the incident saw defendant on a bicycle. He followed defendant into a mobile home park about a mile and a half from M.D.'s mobile home park and detained him inside the park. Defendant told the officer that he had been at work that day digging holes, and that he had gone to the mobile home park to see a friend named Cooper. He first denied entering M.D.'s home, but eventually admitted to it. Defendant claimed he thought it was his friend Cooper's house. A person named Cooper lived in the mobile home park near M.D.'s home.

At trial, the jury learned that three months earlier, defendant pled guilty to petty theft after he stole items from someone at a beach. The jury was read the following stipulation: "That on August 15th, 2016, Jason Thomas King willfully and unlawfully stole the personal property of Kyle G. in a public place, namely, a beach. With the aide of an attorney, he pled guilty on September 7th, 2016, in the County of Orange to misdemeanor petty theft."

4

## 2. Defense Evidence

Defendant testified that he was homeless and was near a riverbed in Costa Mesa when a man named Cooper approached him. Cooper, who defendant had met the day before, offered to pay defendant 20 dollars per hour in cash to dig a trench and said that defendant could stay at his house that night. Defendant had been looking for work. Cooper drove defendant to his house where they picked up tools for the job, and put them into Cooper's pickup truck. Cooper then drove defendant to the work site where defendant spent the next five to six hours digging the trench.

Cooper left defendant's bicycle with him at the work site and told defendant that he would return to pick him up at the end of the day, but did not come back. When Cooper failed to return, defendant decided to make his own way back to Cooper's house. He believed that he could find the mobile home where Cooper lived because he remembered that it was off Pacific Coast Highway. Defendant memorized the work site address and figured that if he was unsuccessful, he could return to the work site later to try to find Cooper.

Defendant rode his bicycle down Pacific Coast Highway and saw a trailer park. He did not think that there were many trailer parks on Pacific Coast Highway, so he assumed that it was the correct park. Defendant rode into the park. In front of M.D.'s house, he saw a pickup truck that he thought was Cooper's truck. It was parked in the same location as defendant remembered it in relation to Cooper's house. Concluding that it was Cooper's home, defendant put his bike down and went to the door. He testified that the door to the house was open, so he knocked before entering and yelled, "Cooper." No one answered, but defendant saw movement in the back of the house. He also saw that inside was a pool table and a kitchen to the right, which was how he remembered Cooper's home to be.

Defendant entered the house. M.D. came out of her room wielding a baseball bat. He recounted telling her to calm down and, "I'm looking for my friend

5

Cooper." Defendant thought that his appearance could be alarming to M.D. because he was shirtless and covered in mud from work, which he acknowledged "probably looked scary." According to defendant, at no point did he go further than five feet or so into the home. He stated that he was in the home for no more than 30 seconds. After his encounter with M.D., he left the home through the front door.

After leaving M.D.'s house, defendant got back on his bicycle and continued riding further down Pacific Coast Highway to look for Cooper's mobile home, which he eventually found. Cooper's home was approximately one and a half miles away from M.D.'s home. Cooper's pickup truck was parked outside. Cooper came out of his house and defendant called out to him. At the same time, a police officer approached. Defendant had turned left to go to Cooper's home, but when the police officer turned his light on, defendant rode his bike over to the officer. He believed that he was going to get a ticket for jaywalking because he had crossed four lanes of traffic. Cooper went back inside his house when he saw the police. Defendant told the officer that he was looking for his friend Cooper. He vehemently denied going into M.D.'s house to steal. Defendant had a backpack with all of his belongings, including a paring knife to use for work, opening food, and other purposes.

Defendant testified at trial that he was not guilty of the petty theft from August 2016, and that he only pled guilty "to something [he] didn't do" to avoid a lengthy prison sentence. Defendant denied ever stealing anything, both in the current case and the August 2016 petty theft offense.

Alan A. also testified for the defense. Alan met Cooper when they lived in the same trailer park a few years prior. Alan's mobile home was located directly across from Cooper's in the mobile home park on Pacific Coast Highway. Alan later moved to Huntington Beach at the address where defendant was digging a trench on the day of the incident. After moving to Huntington Beach, he kept in touch with Cooper because Cooper was handy and helped with odd jobs on some of Alan's properties. On the day of

6

the incident in question, Alan had hired Cooper to perform various odd jobs on the property where defendant dug the trench. Alan testified that on that day, Cooper brought one person to his property to plant trees. He was not sure whether that person was defendant, but remembered that the worker was a white man.

Finally, Dr. Jennifer Bosch testified for the defense. Dr. Bosch is a clinical psychologist who examined defendant for almost two hours in November 2018. He presented with rapid speech and delusions regarding the things he shared with her. The things that defendant reported to Dr. Bosch made no sense and were not grounded in reality. Dr. Bosch diagnosed defendant with a delusional disorder of a persecutory or paranoid subtype. In this diagnosis, the subject's functioning is not markedly impaired and is somewhat functioning. Dr. Bosch could not identify a specific date when defendant began to suffer from this condition, but the file contained evidence that in 2012 something began to change.

## 3. Procedural History

In January 2017, defendant was charged by information with one count of first degree residential burglary for entering M.D.'s residence with the intent to commit larceny and sexual assault. (§§ 459, 460, subd. (a).) It was further alleged there was a person present during the burglary. (§ 667.5, subd. (c)(21).) He was also charged with one count of false imprisonment. (§§ 236, 237, subd. (a).) To differentiate this case (Case No. 16WF2681) from the case we describe below, we will refer to this as the burglary case.

In December of 2017, the court found that defendant was not mentally competent to stand trial and suspended proceedings. In September 2018, a doctor from Patton State Hospital certified that defendant was once again mentally competent to stand trial. In October 2018, the court reinstated proceedings.

7

In April 2019, defendant was charged in a separate case, which we will refer to as the assault case (Case no. 17HF1387). By way of amended information, in Count 1 defendant was charged with assault with force likely to produce great bodily injury with a further allegation that he personally inflicted great bodily injury. (§§ 245, subd. (a)(4), 12022.7, subd. (a).) In Count 2, he was charged with second-degree robbery involving a different victim. (§§ 211, 212.5, subd. (c).) As to both counts it was alleged he committed the crimes while on bail. (§ 12022.1, subd. (b).)

The burglary case first went to trial in May 2019. The jury found defendant not guilty on the false imprisonment count, but hung on the burglary count.

The burglary case was retried in August 2019. This time the jury found defendant guilty of first-degree burglary.

The assault case went to trial in August 2020. The jury found defendant guilty on both counts and found it to be true that defendant personally inflicted great bodily injury in the commission of the assault.

Defendant was sentenced on both cases jointly. The court selected the assault as the principal term and sentenced defendant to the midterm of three years in state prison. On the enhancement for personally inflicting great bodily injury, the court sentenced defendant to a consecutive three years. On the robbery count (count 2 of the assault case), the court sentenced defendant to a concurrent three years in prison. On the burglary case, the court sentenced defendant to a subordinate consecutive term of one-third of the midterm, which was 16 months in state prison. Defendant's total prison term was seven years, four months.

Defendant appealed from the judgments in both the assault case and the burglary case. We consolidated those appeals. However, the issues defendant raises on appeal concern only the burglary case, and thus our discussion of the facts and authorities is limited to the burglary case.

DISCUSSION

Defendant contends that by admitting evidence of his petty theft guilty plea the court committed prejudicial error. The People concede that the court prejudicially erred. We review claims of evidentiary error under the abuse of discretion standard of review. (*People v. Hayes* (1990) 52 Cal.3d 577, 617.) We join the consensus and conclude the court prejudicially abused its discretion.

Evidence Code section 1101, subdivision (a), provides, "evidence of a person's character or a trait of his or her character (whether in the form of an opinion, evidence of reputation, *or evidence of specific instances of his or her conduct*) is inadmissible when offered to prove his or her conduct on a specified occasion." (Italics added.) Subdivision (b) of that section lists certain exceptions: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or whether a defendant in a prosecution for an unlawful sexual act or attempted unlawful sexual act did not reasonably and in good faith believe that the victim consented) other than his or her disposition to commit such an act." Section 1101 is often described as prohibiting the admission of "propensity" evidence. (*People v. Villatoro* (2012) 54 Cal.4th 1152, 1161 ["section 1101(a)'s prohibition against propensity evidence is 'absolute where it applies'"].)

Here, the trial court admitted evidence of defendant's plea to petty theft on the ground that it was relevant to prove defendant's intent, one of the specifically described exceptions in Evidence Code section 1101, subdivision (b). Intent was, in the court's words, "the central issue in the case," as the People were required to prove defendant harbored a larcenous intent at the time he entered M.D.'s home. (See *People v. Walters* (1967) 249 Cal.App.2d 547, 550 ["The gravamen of a charge of burglary is the

9

act of entry which must be accompanied by a felonious intent."].)

"In order to be admissible to prove intent, the uncharged misconduct must be sufficiently similar to support the inference that the defendant 'probably harbor[ed] the same intent in each instance.'" (*People v. Ewoldt* (1994) 7 Cal.4th 380, 402.) "Our high court has repeatedly noted that the probative value of other crimes evidence must be substantial. '"Since 'substantial prejudicial effect [is] inherent in [such] evidence,' uncharged offenses are admissible only if they have *substantial* probative value."' [Citations.] 'If there is any doubt, the evidence should be excluded.' [Citations.] The 'principal factor' affecting the probative value of the evidence of defendant's uncharged offenses is the tendency of that evidence to demonstrate defendant's knowledge and refute mistake of fact in the circumstances of this case." (*People v. Hendrix* (2013) 214 Cal.App.4th 216, 244 (*Hendrix*).)

"In assessing the trial court's evidentiary ruling, we must consider the facts known to the court at the time the ruling was made. [Citations.] Consequently, we look to the prosecution's offers of proof in determining error." (*Hendrix*, at p. 243.) The offer of proof before the court was the following: "[Defendant], in his transient lifestyle at the time, is on the beach, picks up a towel, and on the towel is a portable speaker. The lifeguards see it, stop. Small tussle. No injuries of any sort. The speaker is returned."

There was no similarity between that crime and the charged burglary, other than that they both involved theft. From a factual standpoint, the critical issue in this case was whether defendant entered M.D.'s house by mistake, believing it to be Cooper's house, or whether he harbored an intent to steal from M.D. Nothing about the prior petty theft on the beach bears a relationship on whether he was mistaken about whose home he had entered. The general rubric to be applied under Evidence Code section 1101 is not: he committed a prior theft so he must have intended theft here. That sort of logic would gut the protections afforded by subdivision (a). Instead, the proper approach is: he committed theft under circumstances similar to the circumstances here, and thus the jury

10

can infer he harbored the same intent. Because there were no similar factual circumstances here, the jury could not reasonably draw that inference, and thus the prior theft did not have substantial probative value. Accordingly, admitting evidence of the petty theft was an abuse of discretion.

In assessing whether this error was prejudicial, we employ the test articulated in *People v. Watson* (1956) 46 Cal.2d 818, 836: "That a 'miscarriage of justice' should be declared only when the court, 'after an examination of the entire cause, including the evidence,' is of the 'opinion' that it is reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error." We conclude the error was prejudicial for two related reasons.

First, there was scant evidence bearing on the critical issue in the case— defendant's intent at the time of entering M.D.'s home. He never attempted to take anything. He never made any demands of M.D. He announced himself when he arrived. He consistently offered the explanation that he was looking for his friend Cooper. His explanation was plausible given that he had spent the day working for Cooper, and Cooper lived in a mobile home close by. According to M.D., he appeared to be in an "altered" state of mind, which may have contributed to the mistake. And there was uncontroverted testimony that defendant suffered from a delusional disorder.

The prosecutor made the argument that the dissimilar appearance of M.D.'s and Cooper's mobile homes is evidence of absence of mistake.[2] Aside from the fact that this does not amount to evidence of intent to *steal*, and even assuming there was some dissimilarity, the evidence revealed defendant had only been to Cooper's home one time in his life. There is no evidence to suggest he would have a sufficient familiarity with Cooper's mobile home, especially since both mobile homes were fairly close in proximity. While this was a viable jury argument, it was not particularly strong, and thus

---

[2] We do not have photographs in our record.

11

the admission of a prior crime of dubious similarity created a material risk of misleading the jury.

Second, the evidence of the prior petty theft was used in a way that exacerbated the risk of prejudice. The prosecutor engaged in the following colloquy with defendant: "Q. Mr. King, when you went into [M.D.'s] home on November 15th of 2016, isn't it true that you went in there to steal? [¶] A. No, absolutely not. [¶] Q. *You've stolen before, though, right?* [¶] A. No. I pled guilty to that because they said I could get out of jail in 30 days and get a misdemeanor. Otherwise, I was looking at seven and a half years." (Italics added.) This line of questioning clearly implies the argument that he must have intended to steal in this instance because he stole in the past—precisely the sort of propensity evidence barred under Evidence Code section 1101, subdivision (a). The prosecutor then returned to the same theme in closing argument: "when . . . you're looking . . . to decide what [defendant] was planning to do, you get to consider that he's stolen before. So when he says, 'it was a mistake, I didn't mean to steal,' you get to then use the fact that he's stolen before and say no." The prosecutor failed to make any suggestion that the jury consider the similarity of the two crimes and consider whether they were sufficiently similar to support an inference of intent. It was simply: he stole before, so he must have intended to steal now. Playing on the same argument during rebuttal, the prosecutor said, "And you can use in your determination of whether or not he was intending to steal the fact that he had stolen before, and that when he went into that home, he was going to take something . . . ."

The prejudicial effect of these arguments was exacerbated by the version of CALCRIM 375 that was given to the jury. Although that instruction generally correctly instructs the jury on the limited purpose of admitting uncharged offenses, it contains optional language that the court omitted in instructing the jury here. The optional language is: "In evaluating this evidence, consider the similarity or lack of similarity between the uncharged offense and the charged offense." The omission of that language

12

heightened the risk that the jury, instead of comparing the similarity of the two crimes, would simply revert to the simple conclusion that because he stole before, he must have intended to steal here as well.

Due to both the paucity of evidence on defendant's intent, and the prejudicial manner in which the prior petty theft plea was used, we conclude the court erred in admitting the petty theft plea, and that it was prejudicial.

## DISPOSITION

The judgment in case number 16WF2681 (the burglary case) is reversed. The judgment in case number 17HF1387 (the assault case) is affirmed.

MARKS, J.*

WE CONCUR:

MOORE, ACTING P. J.

GOETHALS, J.

*Judge of the Orange County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.